**UNITED STATES of America, Plaintiff,**

**v.**

**Joseph N. GALLO, Joseph Armone, Joseph Corrao, Robert DiBernardo, James Failla, Joseph Zingaro, Thomas Agro, Robert DeSimone, Jack Giordano, Angelo Ruggiero, Anthony Vitta, George Daly, Louis Giardina, Salvatore Migliorisi, Julius Miron, and Mildred Russo, Defendants.**

**No. 86–CR–452(S) (JBW).**

United States District Court, E.D. New York.

Aug. 28, 1987.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Edward A. McDonald, U.S. Dept. of Justice, Organized Crime Strike Force, E.D.N.Y., Brooklyn, N.Y. by Douglas E. Grover, Laura A. Ward, Christopher Ulrich, for the U.S.

Dominic F. Amorosa, New York City, for defendant Joseph N. Gallo.

Alfred M. Christiansen, New York City, for defendant Joseph Armone.

LaRossa, Mitchel & Rossa, New York City by James LaRossa (Gerald L. Shargel, New York City, of counsel), for defendant Joseph Corrao.

Joel Winograd, Gustave H. Newman, New York City, for defendant James Failla.

Jay Goldberg, New York City (Judd Burstein, New York City, of counsel), for defendant Joseph Zingaro.

Louis R. Rosenthal, Brooklyn, N.Y., for defendant Thomas Agro.

Charles Donovan, New York City, for defendant Robert DeSimone.

Frank T. Geoly, Brooklyn, N.Y., for defendant Jack Giordano.

Hoffman, Pollok, and Gasthalter, New York City by Jeffrey Hoffman, John Pollok, for defendant Angelo Ruggiero.

Richard A. Rehbock, New York City, for defendant Anthony Vitta.

William F. Suglia, New York City, for defendant George Daly.

Condon, LaTona, Pieri & Dillon, Buffalo, N.Y. by John W. Condon, Jr., for defendant Louis Giardina.

DePetris & Meyer, New York City by David DePetris, for defendant Salvatore Migliorisi.

Andrew Lawler, New York City, for defendant Julius Miron.

Gerald B. Lefcourt, New York City (Richard W. Levitt, New York City, of counsel), for defendant Mildred Russo.

WEINSTEIN, Chief Judge:

## MEMORANDUM AND ORDER

The twenty-two count indictment in this case names sixteen defendants. Count One charges that thirteen of these defendants, along with a host of unindicted cohorts, conspired to participate in the affairs of a racketeering enterprise. 18 U.S.C. § 1962(d) (1982) ("RICO"). The remaining twenty-one counts charge fourteen of the defendants with various "substantive" offenses, all relating to the affairs of the alleged enterprise. The non-RICO counts all concern crimes also alleged as predicate acts in the RICO conspiracy count.

The alleged enterprise is the Gambino Crime Family, supposedly one of the five families of the Mafia, or "La Cosa Nostra." It is charged that from 1967 until the date of the indictment, the RICO defendants conspired to participate in the Gambino Family through a pattern of racketeering activity and the collection of unlawful debts. The Family, it is alleged, conspired to engage in at least nine "areas" of illegal activity: murder, extortion, robbery, labor racketeering, loansharking, gambling, obstruction of justice, bribery, and interstate travel in aid of racketeering. The seventy-two predicate acts in the RICO conspiracy consist of forty-six separate specified alleged offenses, representing the violation of eleven different sections of the state and federal criminal codes. In addition, the RICO count charges six of the defendants with conspiracy to participate in the family through the collection of unlawful debts. Nine separate illegal collections are al-

leged. The RICO conspiracy consists of at least 25 separable "schemes," "operations," or courses of conduct. The remaining counts allege "substantive" violations of a majority of the offenses charged as predicate acts in Count One.

According to the indictment, the "purposes" of the Family included, but were not limited to, the following:

Utilizing threats of physical and economic harm to individuals and businesses in the New York metropolitan area, thereby enabling members and associates of the Family to extort and receive illegal payments of money and other things of value from such individuals and businesses;

Obtaining money for members and associates of the Family through the theft of goods and merchandise from individuals and businesses in the New York metropolitan area;

Allocating geographic territory for the conduct of certain ostensibly legitimate businesses, such as the rental and display of coin-operated video machines, and illegal businesses, such as gambling and loansharking;

Obtaining money for members and associates of the Family through the operation of illegal loansharking businesses and the collection of unlawful debts;

Controlling, supervising, and influencing the affairs of certain labor unions, thereby enabling members and associates of the Family to extort and receive illegal payments of money and other things of value from businesses in the New York metropolitan area;

Obtaining money for members and associates of the Family through the operation of illegal gambling businesses;

Committing crimes, including murder, as a matter of duty in order to: (i) enforce the rules and regulations of the Family, (ii) punish those who violated the rules of the Family, (iii) protect both ostensibly legitimate businesses and illegal interests of the Family from encroachment by other criminal groups, and (iv) protect both ostensibly legitimate businesses and illegal interests of the Family from detection by law enforcement authorities;

Obstructing justice and protecting members and associates of the Family from investigation and prosecution by obtaining secret information about government investigations and providing support and financing for members and associates of the Family fleeing from justice;

Providing lawyers for members and associates of the Family who were defendants in criminal proceedings related to the activities of the Family;

Obtaining preferential treatment and other "favors" for incarcerated members and associates of the Family; and

Concealing from law enforcement authorities the existence of the Family, the identity of its members and associates, the means through which it conducted its affairs, and the locations from which it conducted its affairs.

This indictment has been the subject of many oral opinions and five prior written opinions addressing the administration of a complex criminal case. *United States v. Gallo*, 671 F.Supp. 124 (E.D.N.Y.1987) (immunity from self-incrimination); *United States v. Gallo*, 654 F.Supp. 463 (E.D.N.Y.1987) (discovery of defendants' and co-conspirators' statements), *vacated*, No. 87–3018 (2d Cir. May 29, 1987); *United States v. Gallo*, 653 F.Supp. 320 (E.D.N.Y.1986) (pretrial detention for prolonged periods); *United States v. Gallo*, 86–CR–452(S) (E.D.N.Y. June 1, 1987) (available on WESTLAW [DCT database] and LEXIS) (*in limine* ruling on expert testimony regarding organized crime); *United States v. Gallo*, 86–CR–452(S) (E.D.N.Y. March 6, 1987) (available on WESTLAW [DCT database] and LEXIS) (multiplicity of charges).

The complexity and labyrinthian nature of the charged conspiracy and of this case is perhaps best reflected in the attached chart, which tracks the allegations against each of the defendants.

# RICO CONSPIRACY — 18 U.S.C. §19
### COUNT ONE

| Name | McBratney Murder N.J. Penal Law §125.25 | Tambone Murder N.J. Penal Law §125.25 | Other Murders N.J. Penal Law §125.25 | Stewart Color Labs Extortion 18 U.S.C. §1951 | Stewart Color Labs Obstruction of Justice 18 U.S.C. §1503 | E.M. Mechanical Extortion 18 U.S.C. §1951 | Montrose Extortion 18 U.S.C. §1951 | Staten Island Video Extortion 18 U.S.C. §1951 | Gambino Diamond Robbery 18 U.S.C. §1951 | Pat Mobil – $5000 29 U.S.C. §186(b)(1) | Pat Mobil – $5000 Taft-Hartley Violation 29 U.S.C. §186(b)(1) | Pat Mobil – $5000 Taft-Hartley Violation 29 U.S.C. §186(b)(2) | Pat Mobil – Partical Palm Taft-Hartley Violation 29 U.S.C. §186(b)(2) | Pat Mobil – Obstruction of Justice 18 U.S.C. §1503 | Extortionate Loan Extortion – Borsella 18 U.S.C. §892 | Extortionate Loan Collection – Borsella 18 U.S.C. §894 | Extortionate Loan Extortion – Ancona 18 U.S.C. §892 | Extortionate Loan Collection – Ancona 18 U.S.C. §894 | Extortionate Loan Extortion – Others 18 U.S.C. §892 | Collection – Others 18 U.S.C. §894 | Extortionate Loan Extortion – Inem 18 U.S.C. §892 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GALLO | | | X | | | | | | X | | | | | | | | | | | | X |
| ARMONE | | | X | | | | | | | | | | | | | | | | | | |
| CORRAO | | | | | | | | | | | | | | | | X | X | X | X | X | X |
| DiBERNARDO | | | X | | | | | | | | | | | | | | | | | | |
| FAILLA | | | | | | | | X | | | | | | | | | | | | | |
| ZINGARO | | | | | | | | | | | | | | | | | | | | | |
| AGRO | | | | | | | X | | | | | | | | | | | | | | X |
| RUGGIERO | X | X | X | | | | | | | | | | | | | | | | | | |
| VITTA | | | X | X | X | | | | | | | | | | | | | | | | |
| MIGLIORISI | | | | | | | | | | | | | | | | | | | | | |
| DeSIMONE | | | | | | | | | | | | | | | | | | | | | |
| GIORDANO | | | | | | | | | | | | | | | | | | | | | |
| DALY | | | | | | | | | | X | X | X | | | | | | | | | |
| GIARDINA | | | | | | | | | | | X | X | X | | | | | | | | |
| MIRON | | | | | | | | | | X | X | X | | | | | | | | | |
| RUSSO | | | | | | | | | | | | | | | | | | | | | |

# 62(d) — PREDICATE OFFENSES

| Extortionate Loan Collection—Rosen | Extortionate Loan Extortion—Others | Extortionate Loan Collecting—Others | Extortionate Loan | Extortion—Sachez | Extortionate Loan Collection—Sachez | Extortionate Loan Extortion—Others | Extortionate Loan Collecting—Others | Extortionate Loan Extortion—Sullivan | Extortionate Loan Collection—Sullivan | Extortionate Loan Extorsing—Others | Extortionate Loan | Extortionate Loan Collecting—Others | Extortionate Loan Extortion Yonkers Social Club | Extortionate Loan Collection Yonkers Social Club | Yonkers Social Club | Yonkers Sports-Betting Operation | Yonkers Social Club Gambling Operation | Queens Sports-Betting Operation | So. District—Obstruct of Justice—Failla Threatening | So. District Obstruct of Justice—Perrica Indictment | So. District Obstruct of Justice—Crespo Indictment | So. District Obstruct—Steinberg—Other Proceedings | So. District Obstruct—Sevior-Realty Fire Information | Bribery of Federal officials—Perrico Transfer | Bribery of Federal officials—Gallo Transfer | Interstate Travel in Facilitation of Bribery | Obstruct. of Justice—Page Flight |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 U.S.C. §894 | 18 U.S.C. §892 | 18 U.S.C. §894 | 18 U.S.C. §892 | 18 U.S.C. §894 | 18 U.S.C. §892 | 18 U.S.C. §894 | 18 U.S.C. §892 | 19 U.S.C. §892 | 18 U.S.C. §894 | 19 U.S.C. §892 | 18 U.S.C. §894 | 18 U.S.C. §892 | 18 U.S.C. §894 | 18 U.S.C. §892 | 18 U.S.C. §894 | 18 U.S.C. §1955 | 18 U.S.C. §1955 | 18 U.S.C. §1955 | 18 U.S.C. §1503 | 18 U.S.C. §1503 | 18 U.S.C. §1503 | 18 U.S.C. §1503 | 18 U.S.C. §1503 | 18 U.S.C. §201(b) | 19 U.S.C. §201(b) | 18 U.S.C. §1152 | 18 U.S.C. §1503 |
| X | X | X | | | | | | | | | | | | | | | | | | | | | | X | X | X | |
| | | | | | | | | | | | | | | | | | | | | | | | | X | X | X | X |
| | | | | | | | | | | | | | | | | | X | X | X | | | | | | | | |
| | | | | | | | | | | | | | | | | | | X | X | | X | | | | | | |
| | | | | | | | | | | | | | X | X | X | X | | | | | | | | | | | |
| X | X | X | | | | | | | | | | | | | | | | | | | | | | X | X | X | X |
| | | | | | | | | X | X | X | X | | | | | | | X | | | | | | | | | |
| | | | X | X | X | X | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | X | X | X | X | X | | | | | |

## COUNT ONE
### RICO Conspiracy — 18 U.S.C. §1962(d)
### Collections Of Unlawful Debt

| Collection From Riverola 18 U.S.C. §1961 | Collections From Ancona 18 U.S.C. §1961 | Collections From Others 18 U.S.C. §1961 | Collection From Brown 18 U.S.C. §1961 | Collections From Others 18 U.S.C. §1961 | Collection From Sanchez 18 U.S.C. §1961 | Collections From Others 18 U.S.C. §1961 | Collections From Various Individuals 18 U.S.C. §1961 | Collections In Various Social Clubs 18 U.S.C. §1961 | COUNT TWO Conspiracy To Extort Stewart Glue Labs 18 U.S.C. §371 (18 U.S.C. §1951) | COUNT THREE Stewart Glue Labs Extortion 18 U.S.C. §1951 | COUNT FOUR Stewart Glue Labs Obstruction of Justice 18 U.S.C. §1503 | COUNT FIVE E.M. Mechanical Extortion 18 U.S.C. §1951 | COUNT SIX Conspiracy To Extort Staten Island Video 18 U.S.C. §371 (18 U.S.C. §1951) | COUNT SEVEN Port Mobil — $5000 Taft-Hartley Violation 29 U.S.C. §186(b)(1) | COUNT EIGHT Port Mobil — $5000 Taft-Hartley Violation 29 U.S.C. §186(b)(1) | COUNT NINE Port Mobil — $100,000 Taft-Hartley Violation 29 U.S.C. §186(b)(1) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | X | X | | | | | | | | | | | | | |
| | | | | | | X | | | X | X | | | | | | |
| X | X | X | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | X | | | |
| | | | | | | | | X | | | | | | | | |
| | | X | X | | | | | | | | | | | | | |
| | | | | | | | X | | | | | | | | | |
| | | | | | X | X | | | X | X | X | X | | | | |
| | | | | | | | | | X | X | X | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | X | X | X |
| | | | | | | | | | | | | | | | X | X |

| | Count Ten<br>29 U.S.C. § 186(a)(2)<br>Port Mail–Payroll Padre Taft-Hartley Violation | Count Eleven<br>18 U.S.C. § 1510<br>Port Mail–Obstruction Of Justice | Count Twelve<br>18 U.S.C. § 371<br>(18 U.S.C. § 892)<br>Conspiracy To Make Extortionate Loan Extensions | Count Thirteen<br>18 U.S.C. § 894<br>Extortionate Loans Collection–Amount | Count Fourteen<br>18 U.S.C. § 371<br>(18 U.S.C. § 892)<br>Conspiracy To Make Extortionate Loan Extensions | Count Fifteen<br>18 U.S.C. § 371<br>(18 U.S.C. § 894)<br>Conspiracy To Make Extortionate Loan Collections | Count Sixteen<br>18 U.S.C. § 1955<br>Jinkees Sports-Betting Operation | Count Seventeen<br>18 U.S.C. § 1955<br>Jinkees Social Club Gambling Operation | Count Eighteen<br>18 U.S.C. § 1955<br>Queens Sports-Betting Operation | Count Nineteen<br>18 U.S.C. § 201(b)<br>Bribery of Prison Officers–Persico Transfer | Count Twenty<br>18 U.S.C. § 201(b)<br>Bribery of Prison Officers–Gallo Transfer | Count Twenty-One<br>18 U.S.C. § 1952<br>Interstate Travel In Facilitation Of Bribery | Count Twenty-Two<br>18 U.S.C. § 1503<br>Obstruction of Justice–Agro Flight |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | X | X | X | |
| | | | | | | | | | | X | X | X | X |
| | | | X | X | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | X | X | | | | | |
| | | | | | | | | | X | X | X | X | |
| | | | | | X | X | | | X | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | X | X | |
| | | | | | | | | | | | | | X |
| X | | | | | | | | | | | | | |
| X | X | | | | | | | | | | | | |
| X | X | | | | | | | | | | | | |

KEY NUMBER SYSTEM

In addition to the three "non-RICO" defendants (DeSimone, Giordano, Migliorisi), six other unindicted coconspirators are named in the RICO count: Carlo Gambino, Paul Castellano, Ariello Dellacroce, Thomas Bilotti, "John Doe" (John Gotti), and Frank Mastricova. With the exception of Gotti, these coconspirators are deceased. Gambino is alleged to have been the "boss" of the Family until his death in 1976. He was succeeded by Castellano. The indictment describes the structure of the enterprise. The "boss" is responsible both for setting policy and for resolving disputes among family members and other criminal organizations. In return, he receives a share of the "earnings" of each Family "crew." The boss is assisted by an "underboss." The underboss is second-in-command and also receives earnings from the various crews. The "consiglieri," or "counsel," serves as advisor to the boss, underboss, and crew "capos." He also receives a share of the earnings from certain crews. The day-to-day operations of the Family are conducted by groups known as "crews." Each crew is comprised of "made members" of the Family (i.e., official initiates), who are also known as "soldiers" of that crew. The soldiers are in turn assisted by "associates," or "connected" people. These associates are not official members of the Family. Each crew is headed by a "caporegime" ("capo"), or "captain." The capo is responsible for organizing, managing, and supervising the activities of his crew and is responsible for providing support and protection to soldiers and associates. In return, the capo receives a share of all the earnings of each of those soldiers and associates. The capo reports to, and is supervised by, the boss and underboss. There are numerous crews in the Gambino Family.

This indictment concerns the members of at least seven of those crews. At the time of most of the activity specified in the indictment, Castellano was alleged to be the boss, with Dellacroce as underboss and Gallo as consiglieri. Armone, Bilotti, Corrao, DiBernardo, Failla, Gotti, and Zingaro were alleged capos. Soldiers included Agro, DeSimone, Giordano, Mastricova, Ruggiero and Vitta. Daly, Giardina, Migliorisi, Miron and Russo are alleged to have been associates of the Family. The government's version of this part of the Family's structure and hierarchy is reflected in the attached Family "tree." Defendants in this case are indicated by capitals.

Defendant Robert DiBernardo cannot be located by the government. The FBI assumes that he is dead. Defendant Thomas Agro pleaded guilty from his hospital bed,

was released from custody, and died of cancer before being sentenced. Fourteen defendants thus remained to be dealt with. Of these fourteen, three are not charged in the RICO conspiracy count (DeSimone, Giordano, Migliorisi). Five defendants are not alleged to have been "members" in the Family (Daly, Giardina, Miron, Migliorisi, Russo). One defendant is named only on the RICO count, because there is a separate indictment in the Southern District of New York on the corresponding substantive charges (Russo). One has been separately charged in another multiple-defendant RICO case being tried before another judge of this court which will probably last for many more months (Ruggiero). *United States v. Ruggiero*, 83–CR–412(S) (MAC) (E.D.N.Y.).

Various defendants moved to challenge their joinder with the other defendants as improper under Federal Rule of Criminal Procedure 8(b). In the alternative, various individual defendants request a severance under Fed.R.Crim.P. 14. The defendants as a group have, in addition, moved to sever the indictment into three principal parts. The individual movants joined in that motion in the event that their individual severance motions were denied. For the reasons explained below, the court denied the defendants' misjoinder motion under Rule 8(b). The court granted the severance motions in part, pursuant to Rule 14 and the court's inherent power to control the administration of complex criminal cases. The severed portions of the indictment are as follows:

| Trial One | Trial Two | Trial Three | Trial Four |
|---|---|---|---|
| Daly | Giordano | DeSimone | Corrao |
| Giardina | | | Failla |
| Miron | | | Russo |

| Trial Five | Trial Six | Trial Seven |
|---|---|---|
| Zingaro | Gallo | Ruggiero |
| | Armone | |
| | Vitta | |
| | Migliorisi | |

In addition, defendant Migliorisi was given the opportunity to be tried separately in May, but he opted to remain with the larger group, which will go to trial on September 21, 1987. In the event that defendant Ruggiero is still on trial on that date in *United States v. Ruggiero*, 83–CR–412(S) (MAC) (E.D.N.Y.), he, too, will be tried separately.

I. *Joinder*

Rule 8(b) of the Federal Rules of Criminal Procedure permits the government to charge two or more defendants in the same indictment "if they are alleged to have

participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The defendants argue that the indictment here throws together a variety of disparate acts and actors which should properly each be separately charged. More particularly, they allege that the conspiracy charged is at best a number of discrete conspiracies, rather than one multifaceted conspiracy. Citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the defendants claim that the conspiracy charged is like a "wheel," with Paul Castellano at its hub and various independent "spokes" connected to that hub through a variety of different unrelated schemes. Though there may have been a "common center," the defendants contend, the conspiracy charged is insufficient because it is "without the rim of the wheel to enclose the spokes." *Kotteakos*, 328 U.S. at 755, 66 S.Ct. at 1243. *See also Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947) (limiting *Kotteakos* by recognition of "chain" conspiracy with common objective). Thus, it is argued, there are a number of conspiracies charged, and not one.

If we were to apply pre-RICO concepts of conspiracy to this case, we would likely find that a single overarching conspiracy could not be charged based on these allegations. The traditional theoretical conceptions of conspiracy, particularly as evolved in the "wheel" and "chain" concepts, do not adapt well to the vast, elaborate, and diversified operations of the sort found in organized crime families and narcotics networks. As Judge Friendly noted, when applied to the long-term operation of an illegal business, "the common pictorial distinction between 'chain' and 'spoke' conspiracies can obscure as much as it clarifies." *United States v. Borelli*, 336 F.2d 376, 383 (1964), *cert. denied sub. nom, Cinquegrano v. United States*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The "basic difficulty," he noted, "arises in applying the seventeenth century notion of conspiracy, where the gravamen of the offense was the making an *agreement* to commit a readily identifiable crime or ser-

ies of crimes, ... to what in substance is the conduct of an illegal business over a period of years." *Id.* at 384 (emphasis in original).

With the enactment of RICO, Congress supplemented traditional "chain" and "wheel" theories with a new conspiratorial concept—the enterprise. *See* Note, *Conspiracy to Violate RICO: Expanding Traditional Conspiracy Law*, 58 Notre Dame L.Rev. 587 (1983) (authored by N. Ickler). This new notion furnishes prosecutors a much broader scope of authority for joining defendants who are alleged to have participated in a common grouping or association. The RICO conspiracy consists of an agreement to violate the "substantive" RICO law, that is, a conspiracy "to conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," 18 U.S.C. § 1962(c), rather than of a conspiracy to perform any particular predicate crime. The "gravamen" of this kind of conspiracy is the agreement on the "overall" objective, namely, to participate in the affairs of the enterprise. *See United States v. Elliot*, 571 F.2d 880, 902 (5th Cir.1978), *cert. denied sub nom. Hawkins v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Joinder under Rule 8(b), therefore, is automatically authorized simply through the RICO conspiracy charge, which supplies the "sufficient nexus" to tie the various defendants and the diverse predicate offenses together. *United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir.1980), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). *See also United States v. Teitler*, 802 F.2d 606, 616 (2d Cir.1986); *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.1984), *cert. denied sub nom. Rabito v. United States*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). The limitations on the prosecution's power to charge are virtually eviscerated by the RICO conspiracy device.

In light of the RICO enterprise concept, the pattern of racketeering alleged in this case constitutes, "virtually by definition," the "series of acts or transactions"

sufficiently intertwined to permit Rule 8(b) joinder. *United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.1983), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983). Thus, the eleven remaining RICO defendants here are presumptively properly joined in the indictment, even though some of them may have been unaware of the scope or nature of much of the enterprise's activities, and despite the fact that some of them may have been very minor players in the overall scheme of things. "[T]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliot,* 571 F.2d 880, 903 (5th Cir.1978). The three "non-RICO" defendants, DeSimone, Giordano and Migliorisi, are also properly joined, because the substantive counts with which they are charged are also predicate acts for other codefendants in the RICO conspiracy count. *United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.1980). *See also United States v. Castellano,* 610 F.Supp. 1359, 1396–97 (S.D.N.Y.1985).

It matters not that some of the government's proof may at trial be revealed as insufficient as to the nature of the enterprise, the predicate acts, or the connection between them. Rule 8(b) joinder is satisfied by the allegations in the indictment; "facial" sufficiency is all that is required. *Schaffer v. United States,* 362 U.S. 511, 513–14, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960). The government has satisfied that standard here on the basis of the grand jury's RICO conspiracy allegation.

## II. *Severance*

Defendants DeSimone, Giordano, Migliorisi, Ruggiero, Russo, Vitta and Zingaro have each moved for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. In the alternative, they join the defendants' collective motion to sever the indictment into three major parts. All of the defendants claim that a 14–defendant trial would be highly prejudicial to their individual rights to a fair trial.

Rule 14 provides that "[i]f it appears that a defendant or the government is prejudiced by a joinder of defendants in an indictment ... or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires."

The trial court has almost unlimited discretion under Rule 14 to determine whether sufficient prejudice exists to warrant severance. *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Sliker,* 751 F.2d 477, 492 (2d Cir.1984), *cert. denied sub nom. Buchwald v. United States,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985); *United States v. Weisman,* 624 F.2d 1118, 1129–30 (2d Cir.1980); *United States v. Moten,* 564 F.2d 620, 628 (2d Cir.1977), *cert. denied,* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977). Nevertheless, there has traditionally been a strong presumption against splitting up an indictment. The rationale invoked to support this firm practice is that of efficiency. The "general rule" favoring joint trial is designed to "conserve[ ] judicial resources, alleviate[ ] the burdens on citizens serving as jurors, and avoid[ ] the necessity of having witnesses reiterate testimony in a series of trials." *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir.1970). *See also, e.g., United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.1979). Such a rule is said to serve the "public interest in avoiding duplicitous, time-consuming and expensive trials," by promoting the "[e]conomy of judicial manpower and the prompt trial of those accused...." *United States v. Kahaner,* 203 F.Supp. 78, 81 (S.D.N.Y.1962), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). *But see* Section IIIB, *infra.*

Justice Scalia, writing for the Supreme Court in *Richardson v. Marsh,* —— U.S. ——, ——, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987), summarized the current view favoring joint trials:

Joint trials play a vital role in the criminal justice system, accounting for almost one third of federal criminal trials in the past five years.... Many joint trials ... involve a dozen or more codefendants.... It would impair both the effi-

ciency and the fairness of the criminal justice system to require, in all these cases of joint crimes . . . , that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

■ In order to be severed, a defendant must meet the "heavy burden," *United States v. Sotomayor*, 592 F.2d 1219, 1227 (2d Cir.), *cert. denied sub nom. Crespo v. United States*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979), of showing that a joint trial would result in "substantial prejudice amounting to a miscarriage of justice." *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.1985), *cert. denied sub nom. Shipp v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). *See also United States v. Herrera*, 584 F.2d 1137, 1143 (2d Cir.1978). It is not sufficient for the defendant to show merely that he would have a better chance at acquittal in a separate trial. *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984); *United States v. DeSapio*, 435 F.2d 272, 280 (2d Cir.1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

■ Among the factors the court must consider in determining whether the prejudice of a joint trial rises to the level of a "miscarriage of justice" are the following: the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

There are no precise tests applicable to one or a combination of these factors that can provide a foolproof resolution under Rule 14. *See United States v. Moten*, 564 F.2d 620, 627 (2d Cir.1977). None of the factors are themselves dispositive; instead, the court must decide whether the jury would be "reasonably able" to consider the evidence as to each defendant separately, independent of the evidence against his or her coconspirators. Often relied upon is the standard formulated by Judge Weinfeld in *United States v. Kahaner*, 203 F.Supp. 78, 81–82 (S.D.N.Y.1962), *aff'd*, 317 F.2d 459 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963):

. The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?

■ In the case at bar, numerous factors suggest that such compartmentalization by the jury might prove to be very difficult or unlikely as to several of the defendants.

(a) *Complexity of Indictment*

As the number of counts and defendants in an indictment increases, "it is obvious" that the resultant complex trial record makes it more difficult for a jury to keep straight the specific evidence and charges against each defendant. *United States v. Branker*, 395 F.2d 881, 887–88 (2d Cir. 1968), *cert. denied sub nom. Lacey v. United States*, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969). In this case, there

are fourteen remaining defendants, and twenty-two separate counts. Some of the defendants are named only on the "substantive" counts, others on both RICO and substantive counts, and one on RICO only. Many of the predicate RICO acts correspond to substantive counts, while others do not. The jury must decide whether a defendant *conspired*, or agreed, to commit a predicate act, but the parallel non-RICO counts consist of both conspiracies and "substantive" offenses, so that the element of proof on any given "scheme" can be quite confusing. The jury must also distinguish in many cases between extortionate collection of debt predicate acts and collections of unlawful debt. They must determine whether many of the defendants conspired to participate in the Gambino Family through a pattern of racketeering activity *or* through the collection of unlawful debt. They must apply the highly technical and counter-intuitive RICO conspiracy elements to a great range of disparate predicate conspiracies and events. A single jury would be required to make almost a gross of separate decisions of guilt or innocence after a long and arduous trial. Much of the relevant evidence would have been introduced and stored in the jury's collective mind for many months—and a good deal of it introduced only as to certain defendants or certain charges.

### (b) *Disproportionality of Evidence*

The difficulties of a complex, multifarious case such as this are compounded for those defendants against whom only a small portion of the evidence is relevant. The prejudice concomitant with the case's complexity is "particularly injurious" to defendants charged in a small proportion of the counts and who are implicated by only bits and pieces of the evidence. *United States v. Branker*, 395 F.2d 881, 882 (2d Cir.1968). "The jury is subjected to weeks [or months] of trial dealing with dozens of incidents of criminal misconduct which do not involve those [minor] defendants in any way." *Id.* "Inevitable prejudice" to the peripheral defendants is caused by "the slow but inexorable accumulation of evidence" against the major players. *United*

*States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965). The sheer volume of such evidence against coconspirators, especially when the prejudiced defendants sit in court for weeks or months on end without their names so much as being mentioned, *id.*, can so unbalance the scales that "no amount of cautionary instructions could ... undo [ ] the harm...." *Id.* at 758. Where the evidence against the "minor" defendants is " 'so little or so vastly disproportionate' in comparison to that admitted against the remainder of the defendants," *United States v. Capra*, 501 F.2d 267, 281 (2d Cir.1974) (quoting *United States v. Rizzo*, 491 F.2d 215, 218 (2d Cir.1974)), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975), the likelihood of spillover prejudice is greatly enhanced. *See United States v. Gilbert*, 504 F.Supp. 565 (S.D.N.Y.1980) (severing one of three defendants where "disproportionate involvement" in overall scheme raised substantial risk of prejudice by accumulation of evidence against codefendant). The courts must be scrupulous to avoid the spectre of guilt by association—or, more likely, guilt by confusion.

There would be no serious issue as to coconspirator Castellano, who the government alleges to have been at the center of all this activity. Similarly, defendant Gallo is involved in so many of the predicates and non-RICO counts, and allegedly had such a central position in the enterprise, that spillover prejudice against him is unlikely. But several of the defendants here were only peripherally involved in the alleged enterprise. Their activities often extended to discrete and finite schemes or activities. They conspired to participate in the Family for very limited purposes. Whereas this relatively minor activity would be sufficient, if proven, to convict them on the RICO charge, they should not be burdened with the stigma of those more actively involved.

The problem is especially acute for those defendants whose alleged activities did not include the sort of violent or heinous offenses with which some of their brethren are charged. In particular, four of those

defendants who are not alleged to have been "members" of the Family—Daly, Giardina, Miron and Russo—are alleged to have "associated" with the enterprise only for the purpose of particular, discrete illegal episodes, and do not seem to have contemplated an ongoing, indefinite association with the Family. Their alleged offenses, consisting of Taft-Hartley violations and obstructions of justice, are different from the murders, robberies, and extortions prevalent in the rest of the indictment. There is no indication that they necessarily knew of the enterprise's violent racketeering activity, and at the very least they did not become affiliated with that part of the Family's affairs. As to each of these defendants the court must consider the "gross disparity in the quantity and venality" of the evidence against the joint defendants. *United States v. Sampol,* 636 F.2d 621, 647 (D.C.Cir.1980). *See also United States v. Claytor,* 52 F.R.D. 360 (S.D.N.Y.1971) (severance granted because of violent nature of codefendant's alleged crime). Similarly, defendants DeSimone and Giordano are not charged with any "violent" crimes. If, however, they were members of the family as charged, then they were likely aware of the nature of the ongoing activity, and it may be inferred that they may have acquiesced in the more violent aspects of the racketeering conspiracy.

**(c)** *Antagonism of Defense Strategies and Theories*

■ A "simple showing" of some antagonism between defendants' theories of defense does not in and of itself require severance. *United States v. Carpentier,* 689 F.2d 21, 27–28 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983). The incompatibility of defense theories and trial strategies, however, may significantly redound to the detriment of all, and thus may be considered as a factor in a Rule 14 severance analysis. And if the defenses reach a level of antagonism such that the jury must *necessarily* disbelieve the testimony offered on behalf of one defendant in order to believe the "core of testimony" offered on behalf of another,

severance would be compelled at that stage in the trial. *Id.* at 28 (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981)). Because of the sheer number of defendants involved here, we may anticipate that there may arise some prejudicial antagonism, even if it does not rise to the level where severance would be *required.* This, too, weighs in favor of splitting the indictment for trial.

**(d)** *Evidence Admissible Only as to Some Defendants*

In a serpentine case such as this, there will invariably be a great many instances in which the court will at trial admit evidence as to some defendants but not others. Similarly, the court will admit certain evidence as to some counts and predicate acts and not as to the rest. There will be numerous instances where "selective" admission will be allowed of declarations against interest, admissions of a defendant, similar past offenses, and coconspirators' statements. These evidentiary discriminations often result in prejudice to the defendant against whom the proof is inadmissible. *See, e.g., United States v. Ong,* 541 F.2d 331 (2d Cir.1976) (severance required where codefendants "literally convicted themselves out of their own mouths" on tape recordings), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).

In particular, the voluminous tape recordings which are central to the government's case contain a wealth of coconspirators' statements. To compound the difficulty, there are numerous charged conspiracies (in the substantive counts and in the predicate acts) in addition to the central RICO conspiracy and various possible uncharged conspiracies which will need to be evaluated on rulings under Rule 801(d)(2)(E) of the Federal Rules of Evidence. There are conspiracies within conspiracies, and conspiracies to conceal other conspiracies, conspiracies which are discrete and finite, and those which are amorphous and indefinite, involving conspirators joining and leaving the conspiracy at various times. Admissibility decisions under *United States v. Geaney,* 417 F.2d 1116 (2d

Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), will often depend on having faith in the jury's ability adequately to heed extraordinarily intricate limiting instructions (e.g., this statement is only admissible as to defendant A on Counts X and Y, and predicates 6, 9, 20 and 21; to defendant C on Count Y, Count Z, Count W, and Count V, and on predicates 1, 2, 7, 8, and 9; .... and to defendant N not at all). Over the course of several months, this task would be virtually impossible without the aid of a computer, given the numerous defendants and charges.

There would also be many instances where evidence admitted against one defendant would also be relevant as to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate trial of that defendant alone because its probative value would be outweighed by the danger of unfair prejudice. This court has in fact excluded much of the tape recordings in the severed trials pursuant to Rule 403, even though they may have been probative under Rule 401. Coconspirators' statements regarding violent activities that are part of the RICO conspiracy but not part of the defendant's alleged predicates are but one example of such excluded evidence. *See also United States v. Praetorius,* 462 F.Supp. 924, 927–28 (E.D.N.Y.1978), *cert. denied,* 444 U.S. 869, 100 S.Ct. 144–45, 62 L.Ed.2d 94 (1979). Admission of this evidence at a separate trial would be "grossly disproportionate to any conceivable legitimate probative value that proof would have...." *Id.* at 928. It would, however, be wholly unreasonable for a jury to "perform the intellectual feat in a joint trial" of using such proof against some defendants and ignoring it as to others. *Id.*

### (e) *Inadequacy of Limiting Instructions*

The use of cautionary instructions to the jury has for good reason long been an accepted practice in our trial procedure. In most cases, the jury system itself depends on the assumption that the jury will follow the judge's instructions to limit consideration of some evidence to certain defendants and issues to the exclusion of others. *See*

*Richardson v. Marsh,* —— U.S. ——, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987); *Delli Paoli v. United States,* 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278 (1957). It is "not unreasonable" to conclude that in most cases the jury "can and will" follow the judge's instructions to disregard information as to certain persons or charges. *Bruton v. United States,* 391 U.S. 123, 134, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). The efficacy of such instructions has thus been cited as a pivotal reason for denying severance in many cases. *See, e.g., United States v. Ventura,* 724 F.2d 305, 312 (2d Cir.1983); *United States v. Losada,* 674 F.2d 167, 171–72 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); *United States v. Lyles,* 593 F.2d 182, 190 (2d Cir.1979), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. DeSapio,* 435 F.2d 272, 280 (2d Cir.1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

In *Richardson v. Marsh,* —— U.S. ——, ——, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), the Supreme Court suggested that faith in the ability of a jury to follow instructions is not essential, when it wrote:

> The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.

Nevertheless, the trial judge must be convinced that the jury being addressed has a reasonable chance of understanding and acting upon instructions from the court. Any other approach undercuts the role and dignity of the trial judge, who is put in the position of uttering what he and everyone else in the courtroom knows is the equivalent of pure gibberish. In a democratic nation's judicial system, dedicated to truth and justice, such a lack of connection with reality is unacceptable. While the utility of limiting instructions "is not to be invariably rejected, neither should it be invariably ac-

cepted." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980).

There have been eloquent voices, such as that of Learned Hand, which have argued that many instructions are a "placebo," because "relatively few persons have any such power [to disregard evidence], involving as it does a violence to all our habitual ways of thinking," *United States v. Delli Paoli*, 229 F.2d 319, 321 (2d Cir.1956), *aff'd*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), and because such evidentiary distinctions require of the jury "a mental gymnastic which is beyond, not only their powers, but anybody else's." *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932), *cert. denied*, 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945 (1932). This extreme skepticism about the jury's abilities cannot be adopted consistent with our traditional jury system, and is probably inaccurate in almost all standard cases. There will, however, inevitably be "some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135, 88 S.Ct. at 135. These complex, multi-count, multi-defendant cases would seem to constitute such a context. There are "manifest" difficulties in cases such as this of compartmentalizing all of the independent evidence and of focusing the jury's attention on only the non-hearsay, non-excluded evidence as to each defendant and each charge. *United States v. Agueci*, 310 F.2d 817, 840 (2d Cir.1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963). To indulge in the supposition "that jurors can properly assess such [voluminous] evidence and determine from it the individual guilt of each of many defendants," is perhaps "somewhat naive." *United States v. Bufalino*, 285 F.2d 408, 417 (2d Cir.1960).

This case is far too extensive and intricate to expect that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that would be required by the inevitable plethora of limiting instructions necessary. And even where jurors would at first attempt to heed the judge's admonitions, they could hardly be expected to retain such precise discriminations weeks and months down the line, when they retire to deliberate on the basis of a warehouse of diverse evidence. Reliance on the efficacy of limiting instructions is especially dubious as to evidence which does have some probative value as to a defendant, but which would be excluded under Rule 403 in a separate trial. In the severed trials that have already been completed in this case, there has been a great deal of such excluded information. As Judge Nickerson noted in a similar situation inolving such evidence, "[t]o expect a jury to perform the intellectual feat in a joint trial of using such proof against [some] defendants but not against [others] is to ask too much of lay (and perhaps of judicial) minds." *United States v. Praetorius*, 462 F.Supp. 924, 928 (E.D.N.Y.1978). *Cf. United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980) (balancing required by Rule 403 would never be needed if limiting instruction insured that jury would consider evidence only for purposes for which it was admitted).

### (f) *Rule 14 Balancing*

Although the assumption has traditionally been strongly in favor of a joint trial on a well-pleaded indictment, particularly in a RICO conspiracy where all the defendants are implicated in the enterprise activities as a whole, "there are limits to the risks a co-defendant must endure." *United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980). Those limits have been reached here with respect to several of the defendants, on the basis of the combination of factors discussed above. Rule 14 thus counsels strongly in favor of certain severances. However, the prejudices to the defendants are not clearly dispositive in and of themselves, and we might be reluctant to grant such severances on Rule 14 alone. Just as important as the issue of prejudice is that of the efficient administration of justice. In particular, we question the traditional assumption that denial of severance in cases such as this promotes effi-

ciency. It is to this factor that we now turn.

### III. *Inherent Power to Control the Administration of Complex Criminal Cases*

■ As noted above, it has long been assumed that a single, joint trial is more efficient than several splintered trials, especially where the defendants are all joined in a common conspiratorial scheme. That shibboleth should not unreflectively be taken for granted in the complex, multi-defendant case.

### A. *Deleterious Effects of Prolonged Complex Cases*

Trials in these "monster" cases have constituted an enormous burden on the courts, as well as on defendants, the defense bar, jurors, and even prosecutors. *See generally* Weinfeld, *The Problems of Long Criminal Trials*, 34 F.R.D. 158 (1963). The court must coordinate the schedules of scores of persons for months on end. The absence of one juror, one defendant, one defense attorney, one prosecutor, or even some witnesses, can throw a clog into the trial that brings it to a halt. Some of these trials are now continuing for well over one year, with comparable time spent on pretrial matters. *See, e.g., United States v. Badalamenti,* 84–CR–236 (S.D.N.Y.) (17–month trial; over three years between indictment and verdict); *United States v. Ruggiero,* 83–CR–412 (E.D.N.Y.) (trial still ongoing more than four years after indictment returned); *United States v. Accetturo,* 85–CR–292 (D.N.J.) (four-month jury selection; trial now five months long estimated to last another year; indictment returned over two years ago).

These almost endless trials obviously work severe hardships on the jurors selected. They are removed from their normal lives for inordinate stretches of time, and are subjected to an alien and often confusing system. They must sit stoically and silently for hours every day, day after day. They must absorb vast quantities of information, try to keep it in order, and evaluate its credibility and probative value. They must also perform the "mental gymnastic" discussed above of properly considering the various permutations of the many limiting instructions they are given. The process as a whole is undoubtedly draining, disorienting, exhausting, and often demoralizing.

There are severe disadvantages to the defendants as well, in addition to the likely prejudice considered under Rule 14. Due to the extended length of these proceedings, defendants are often denied their choice of counsel, because many attorneys cannot afford to commit themselves to such a time-consuming and costly operation. Most of the esteemed defense attorneys in this area are members of very small firms or are sole practitioners. Representation of one of these defendants virtually means sacrificing the entire remainder of one's clientele. The local defense bar has recently expressed grave concerns about the discrimination of their practices as a result of months and years spent by counsel in one courtroom. Many of the defendants in this and other similar cases have had to retain new trial counsel after preparing for the trial with their original attorney of choice, because the first lawyer had too many conflicts with other cases. The fees for a counsel who must attend court many months are enormous.

Defendants must themselves sit through month after month of trial, thus radically disrupting their employment and home life. Those being detained are forced to endure prolonged periods of pretrial incarceration while they are presumed innocent. *See United States v. Gallo,* 653 F.Supp. 320 (E.D.N.Y.1986). We have recently been confronted with the extraordinary and unprecedented phenomenon of defendants being acquitted after many months of preventive detention. *See, e.g., United States v. Gotti,* 85–CR–178 (E.D.N.Y.).

Defendants will not receive a final judgment on the charges against them until long after their indictment. Their Sixth Amendment rights to a speedy trial are stretched about as far as can be without making a mockery of that constitutional protection.

Finally, trial judges in these multi-defendant endless cases are confronted by a "great problem ... of trial management." *United States v. Agueci*, 310 F.2d 817, 840 (2d Cir.1962). The judge must, to begin with, make numerous decisions on the admissibility of evidence, and must fashion admonitions to the jury regarding the proper limited consideration to be accorded much of the proof. The complexity and fragility of this task in such a convoluted and prolonged case is suggested by the discussion above. The court also is faced with numerous problems of scheduling and administration. To set a trial date, the court is dependent on the schedules of dozens of attorneys, and the possible involvement of defendants in other cases. If this court were to have waited for all of the principals and their attorneys in this case to be available, none of the defendants would have gone to trial until this November at the earliest. As it now stands, only defendant Ruggiero will be awaiting trial at that time, and only because he has been engaged in another trial in this courthouse. All of the other 13 remaining defendants should have had their cases completed by that time.

If the court does decide to try the case as a whole, the judge must adjourn the remainder of his or her civil and criminal calendars for an indefinite and protracted period of time. The effect under the individual calendar system is ruinous. The already overburdened docket of the court reaches a breaking point, and the administration of justice in *all* of the court's cases is unconscionably delayed. The judge effectively presides over a one-case court. Where the judge decides to sever the trial, the court is left with much greater flexibility to administer both that and other cases. The calendar is more easily adjusted and controlled, conflicts are more readily reconciled, and some normalcy remains as to the rest of the court's docket.

In addition to the factors already noted, there is one that has not been adverted to in the case literature, namely, the deleterious effect on the trial judge of these extremely long, complex, multi-defendant trials.

As Chief Judge of this court, I have observed judges both in this court and in other courts during the pendency of cases that lasted many months. The effect on the judge's health presents a serious matter of concern. The grinding tension of such a long, complex case, particularly where the judge is making rulings which are continuously on the borderline of probative force and prejudice, is debilitating. The worry about frequent adjournments necessitated by the unavoidable problems of 18 jurors, 10 or more defendants, 10 or more counsel for the defendants, and any prosecutorial persons and witnesses and other personnel, all of whom must be present at all times, creates added tensions.

After the case has been under way for some time, the judge is increasingly concerned about the possibility of a mistrial, which would require yet another extended period in tying up the court. Thus, as the trial develops, it becomes increasingly difficult for the court to view objectively the case and its evidentiary decisions without the added tension of avoiding errors that might result in a mistrial or reversal. The judge knows that the court cannot afford the time for retrial and he or she may be pressed to make decisions to avoid that eventuality, instead of deciding issues only as an informed trial judge's conscience mandates.

It becomes increasingly doubtful whether a court so concerned with the need for avoiding a retrial and avoiding error can preside in a relaxed way completely unconcerned with the outcome and concentrating only on the due process that is requisite under our system of justice. The judge's ability to remain detached and objective is compromised. The option of a mistrial and a restarting of the case is almost closed when such a large expenditure of time and effort would be wasted.

Moreover, the judge's and attorneys' fatigue, as long trials grind on, results in more mistakes, shortened tempers, and reduced ability to smooth over the inevitable conflicts of counsel and court under our adversary system. To alleviate these prob-

lems, adjournments, abridged trial days, and four-day trial weeks are required.

### B. *Does Severance Save Time?*

The discussion above is premised on the assumption that severance in these complex cases will save time in the long run. At the very least, it is safe to say that the severed case remedies the delay in trial that is inevitably necessitated for *some* defendants by a joint proceeding, because the court does not have to wait until all the parties and their counsel are available. The Speedy Trial Act recognizes that joinder of defendants is a major source of delayed trial, *see* 18 U.S.C. § 3161(h)(7), and practice in this court is confirmatory.

Courts have almost uniformly taken the view that actual trial time is exponentially increased by severing a large conspiracy case, because it is assumed that the government will have to prove the same case a number of different times, and will present the same evidence repeatedly. Joint trial allegedly "conserves judicial resources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials." *United States v. Borelli*, 435 F.2d 500, 502 (2d Cir.1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). Severance, on the other hand, supposedly necessitates "duplicitous, time-consuming and expensive trials." *United States v. Kahaner*, 203 F.Supp. 78, 81 (S.D.N.Y.1962).

These assumptions support joint trials *only* when the indictment charges crimes "'which may be proved against all the defendants by the same evidence and which result[] from the same or a similar series of acts.'" *Borelli*, 435 F.2d at 502 (citing *Kahaner*, 203 F.Supp. at 80–81). In cases like the one at bar, however, the defendants are charged with a startling variety of multifarious acts and predicate offenses even though they are all part of, or connected to, the RICO conspiracy. The series of events, the schemes, the evidence and the witnesses, are not identical in the various "portions" of this case. The proof of the enterprise must be made as to all of the RICO defendants, and the role of Paul Castellano must be elaborated as to each of the parties, but these are minor elements of any particular charge. Unlike a traditional conspiracy, where all of the principals will likely have been involved in the same events and agreements, we instead confront here a conspiracy to participate in a multi-faceted enterprise. The agreement to participate takes many diverse and unrelated forms among the participants. Proof against each of them is hardly duplicitous. Such is the catch-all nature of the RICO law. The Gambino Family is alleged as a wide-ranging criminal network of highly diverse crimes.

The government claims, however, that the same evidence of all of the activities of each of the codefendants would be admissible at each severed trial. Government's Brief at 49. In that case, not only would the trial be endlessly repeated in full, but the defendants also would not be protected against "spillover" prejudice. The government also somewhat inconsistently argues that severance "would prevent the jury from obtaining a complete understanding of the Family's criminal conduct" and "would hamper the jury's ability to understand the operation of the Family." Government Brief at 4. *See also United States v. Persico*, 621 F.Supp. 842, 852 (S.D.N.Y.1985) ("comprehensive presentation"). The prosecutors have repeatedly argued orally that severance denies the government the opportunity to present to the jury the "big picture."

What the "overall view" argument neglects is that the evidence that is used to prove the "big picture" should in a joint trial be limited to that which would be admitted at a trial of a single defendant. If it would be excluded at the severed trial, it should be excluded as to that defendant at the joint trial. *See* Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudicies*, 77 Mich.L.Rev. 1379, 1394 (1974). This will often be the case even as to evidence which is relevant to charges against the severed defendant under Rule 401, because, as already noted, such evidence is often excluded under Rule 403.

This understanding also defeats the government's more formidable argument. The government would not be able to introduce unlimited "enterprise" evidence at the individual trial of each defendant. Despite the alleged conspiracy, not all of the evidence as to each defendant comes in against each codefendant. Even many coconspirators' statements admissible under Federal Rule of Evidence 801(d)(2)(E) would be excluded as to certain defendants, either because their prejudice would outweigh their probative value, or because the proof for the element they are introduced to prove, i.e., that which tends to show the existence and functioning of the enterprise, is cumulative. In the trials that have been held so far in this case, the government has not been denied admission of any evidence that it would have been able to offer against a defendant at the joint trial; and it has suffered no prejudice on account of this, since it has been able to easily prove the enterprise in each instance. *See United States v. Gallo*, 86–CR–452(S) (E.D.N.Y. June 1, 1987) (available in WESTLAW [DCT database] and LEXIS) (expert used to summarize nature of crime family in brief testimonial appearance).

The primary duplicative evidence in the series of severed trials ordered here, then, is the "enterprise" evidence which is introduced to show the existence, structure, and operations of the Family. This portion of the case has not taken more than two or three days in any of the trials.

Moreover, the "overall" trial time probably has been *diminished* in this case by splitting up the trials without substantial overlap. The trial is much smoother and more concise. The evidence in each case does not scatter about the various contours of the conspiracy. There are one or two or three defense counsel cross-examining and raising objections rather than one or two dozen. Sidebars are much more infrequent. Continuances and adjournments are less common. *See United States v. Agueci*, 310 F.2d 817, 841 (2d Cir.1962).

More significantly, the later trials are certain to be shortened or even precluded by the earlier trial or trials. The government will get a better sense of what is effective, and where the strength of its proof lies. Prosecutors are more aware of what the jury responds to, and what it ignores. The court itself becomes much more familiar with the nature of the case and the evidence, thus enabling more expeditious and more efficient rulings. Duplicative and cumulative evidence becomes easier to identify and exclude. The conspiracies can be verified more readily in motions under Rule 801(d)(2)(E) to admit coconspirators' statements. Each successive trial moves at a quicker and smoother pace than the last.

Most important, there is a significant possibility that certain severed defendants may plead guilty after they have seen the government's method and quality of proof in the preceding trials. The imminence of their verdict will no doubt sharpen their judgment. The proof against them is crystalized in preparation for their trials, and thus a strong government case is more easily recognized. Two defendants in this case, DeSimone and Russo, have in fact pleaded guilty following their severance from the main case. Such developments save the time of the defendants, counsel, witnesses, jurors, and the court.

In this way, severance may in fact be *beneficial* to the government. As the Second Circuit has suggested, it might be "much wiser" to break up these huge cases. *United States v. Sperling*, 506 F.2d 1323, 1341 n. 25 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). In addition to the increased likelihood of guilty pleas, the government gains the opportunity to learn from its early mistakes. Prosecutors usually fear exposing their case to those awaiting trial, but such exposure may encourage pleas and sharpen the latter cases. It follows, then, that the government may well be more successful in later severed cases than in earlier ones. *See* Weinfeld, *The Problems of Long Criminal Trials*, 34 F.R.D. 155, 161 (1963).

In addition, severed trials protect the government from one of the largest dangers of a joint trial, namely, proving to the jury that one conspiracy exists rather than

multiple conspiracies linked at the top. The necessity of having the jury find a *single* conspiracy "can prove seriously detrimental" to the government's strategy. *United States v. Sperling*, 506 F.2d 1323, 1341 (2d Cir.1974). Finally, the government exposes itself to less chance of reversal in a severed case, because the appellate court is less likely to find multiple conspiracies, and less likely to determine that unfair prejudice tainted the conviction of a defendant. *See id.* at 1340–41.

Witness inconvenience and safety are often cited as compelling factors favoring a single, long trial. *See, e.g., United States v. Lyles*, 593 F.2d 182, 191 (F.2d 1979); *United States v. Borelli*, 435 F.2d 500, 503 (2d Cir.1970); *United States v. Persico*, 621 F.Supp. 842, 852 (S.D.N.Y.1985); *United States v. Castellano*, 610 F.Supp. 1359, 1411 (S.D.N.Y.1985). These considerations are diminished, however, where the severed trials concern aspects of the enterprise which are clearly separable and independent. In this case, the only common witnesses in the various trials should be the federal law enforcement agents. As the case was originally split up, the need for duplicative testimony from civilian witnesses who might have been endangered or inconvenienced was negligible. As it turned out, because of various pleas and rearrangements, there will likely be no witnesses except agents who will need to testify more than once. *See United States v. Sperling*, 506 F.2d 1323, 1341 n. 25 (2d Cir.1974) (severance viable where no common witnesses).

## IV. *Severance Determinations*

For all of the reasons discussed above, this case is severed into the following separate trial segments:

### (a) *Daly, Giardina, Miron*

 These three defendants were charged with RICO conspiracy, Taft-Hartley labor racketeering, and obstruction of justice. The offenses and predicate acts with which they were charged all involved a single, discrete episode of criminal activity relating to the Port Mobil Oil Facility on Staten Island. They were not charged in any other predicates or counts, and no other defendants were charged in the Port Mobil scheme. They are the only defendants changed under the Taft-Hartley Act. Their case was thus clearly separable from the whole. The enterprise proof took only two days to present.

None of these defendants was alleged to be a member of the Gambino Family; each was named as a mere "associate." They seem to have joined the RICO conspiracy if at all only for the purposes of this one illegal operation. The government was thus confronted in their case with a problem of proof of association common to only one of the other defendants (Russo).

Under the RICO conspiracy law, the prosecution has the burden of proving that the pattern of racketeering activity was sufficiently related to the enterprise so as to evidence an agreement to participate in the enterprise activities, that is, the "connection" between the enterprise and the predicate acts. To satisfy this burden, the government must prove that the defendants intended to participate in the Family through their racketeering activity. Even in such a modern "enterprise" theory of conspiracy, "the gist of the offense remains the agreement." *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir.1964). Thus, in addition to proving the enterprise and the pattern of racketeering activity in a RICO conspiracy, the government must prove that a defendant "conspired to participate in the affairs of the [Gambino] crime Family *by engaging in the predicate offenses.*" *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.1984) (emphasis supplied). Mere association with the enterprise is not sufficient, nor is the fact that the predicate offenses had some effect on the enterprise's affairs. "[S]ome connection more significant than a fortuitous effect on [the] enterprise [must] be shown." *United States v. Castellano*, 610 F.Supp. 1359, 1401 (S.D.N.Y.1985).

It is well to recall that the statute makes it illegal to conspire to "conduct or participate" in the enterprise's affairs "through" a pattern of racketeering activity. 18

U.S.C. § 1962(c). *See United States v. Weisman,* 624 F.2d 1118, 1124 (2d Cir. 1980), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1981). One conducts the activities of an enterprise through the predicate acts "when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of the enterprise." *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Most of the defendants in this case would satisfy the first prong of this test if the government could prove that their activities were performed in their capacity as "members" of the Gambino Family. But associates, such as Daly, Giardina, Miron and Russo, probably could only be connected through the second prong, which would require that they agree to commit offenses relating to the activity of the enterprise. The jury in the Port Mobil trial was thus charged that in order to find the "connection," it had to find that a defendant had knowledge of the enterprise and at least some of its criminal activities, and knowledge that his personal predicate activities were intended to be committed in the conduct of, and in furtherance of, the enterprise's affairs.

In the Port Mobil trial, the court granted defendant Daly's Rule 29 motion after the trial to dismiss the RICO conspiracy count, because it had not been shown that his acceptance of the payoffs was sufficiently related to the Gambino Family. Such a determination would have been much more difficult to make at the end of the extended 14–defendant trial. It is also likely that a jury may not have been able clearly to distinguish Daly's activities as non-enterprise-related if he were "infected" at a complex trial with the taint of many codefendants. The "connection" issue was most significant for these three defendants, and was most clearly and fairly determined in a severed trial.

Trial of the Port Mobil case began on March 9, 1987, and lasted two weeks. Daly was convicted on Counts Seven and Nine

and acquitted on Count Eight. Miron and Giardina were each convicted on Count One (RICO conspiracy; the jury found two predicate acts), Count Nine, and Count Eleven. Count Ten was dismissed by the court as to all three defendants.

### (b) *Giordano*

Defendant Giordano was charged only in Count 22, obstruction of justice by assisting the unlawful flight of defendant Agro. The court requested a proffer of evidence from the government before trial was to commence. Upon careful examination of the government's one tape-recording which allegedly implicated Giordano, it became clear that the evidence against him was not highly probative. The government dismissed the charge against Giordano without going to trial on March 27, 1987. It is possible that such a focused assessment would not have occurred in a non-severed trial. If it had not, Giordano and his counsel would have had needlessly to sit through months of trial, only a smidgen of which was even remotely related to Giordano.

### (c) *DeSimone*

DeSimone also was not charged in the RICO count. He was charged in Counts 21 and 22 with assisting in the bribery and interstate travel relating to the prison transfer of defendant Gallo's son. Much of the enterprise evidence, and almost all of the predicate act evidence, would have been inadmissible as to DeSimone. DeSimone pleaded guilty to both counts on May 1, 1987, after being able to carefully inspect the specific evidence the government was planning to offer in his severed case. This scrutiny, and the resultant plea, may not have occurred in the 14–defendant trial.

### (d) *Corrao, Failla, Russo*

These three defendants were the only defendants charged in the predicate acts concerning the alleged obstruction of justice in the Southern District of New York through the dissemination of classi-

fied grand jury matters. In addition, Corrao was charged with various loansharking offenses, and Failla was charged with extortion in the video games business. No other defendants were named in these particular predicates and counts. Thus, the case against these three defendants was neatly separable.

Russo was confronted with the same problems of "connection" to the enterprise as discussed in the Port Mobil section, *supra*. That issue would have been much easier to isolate and evaluate in this severed trial. On May 29, 1987, however, Russo pleaded guilty before this court to non-RICO counts pending in the Southern District. Those counts involved the same events as those alleged here, without the enterprise connection. The government subsequently dismissed the RICO indictment against Russo.

Trial of Corrao and Failla took under three weeks. They were both found not guilty on all counts. Tainting them with a long fourteen-defendant trial would obviously have been unfair.

### (e) *Zingaro*

■ Zingaro was charged with predicate offenses relating to loansharking and gambling associated with social clubs in the Bronx. The gambling allegations also formed the basis of two substantive counts. No other defendants were charged in these schemes.

On July 9th, after an eight-day trial, Zingaro was found not guilty on Counts 16 and 17, and the jury found that the government had not proven the gambling RICO predicates. He was, however, found guilty of the RICO conspiracy, on the basis of two predicates, extortionate extensions and collections of credit, and one collection of unlawful debt. As in the cases of Corrao and Failla, a long fourteen-defendant trial would have been quite unfair to him.

### (f) *Gallo, Armone, Vitta, Migliorisi*

■ This trial, which is scheduled to begin on September 21, 1987, involves two primary areas of unlawful activity: the extortion and obstruction of justice relating to Stewart Color Labs (in which Armone, Vitta, and Migliorisi are implicated), and various bribery and obstruction schemes concerning transfer of prisoners in federal facilities and the flight of defendant Agro (in all of which Gallo and Armone are named). In addition, Gallo and Vitta are each charged in various other counts and predicates which, with one minor exception (a tape-recording which also involves Ruggiero on one predicate), are unique to those defendants.

Migliorisi is charged only on the substantive Stewart Color counts. He is not charged under RICO. While this distinction is not in itself sufficient to sever him under Rule 14, the court gave Migliorisi the option of proceeding individually in May (when the court's calendar had an opening), or being tried with the group in September. Migliorisi chose the latter. If he had chosen to be tried in May, the substantial part of the Stewart color case would have been tried twice, but this would probably have made it more efficient the second time around. As it is, that case will be tried only one time.

### (g) *Ruggiero*

■ Ruggiero is still on trial in this courthouse in *United States v. Ruggiero*, 83–CR–412 (MAC) (E.D.N.Y.). Were it not for this ongoing trial, it would have been possible and desirable to try him with Gallo, Armone, Vitta and Migliorisi. Having them wait for Ruggiero is unfair since some of them are insisting on a prompt trial.

It is not expected that the other Ruggiero trial will end before late October at the earliest. Thus, Ruggiero will have to be tried separately. Fortunately, all of the charges against him except for one predicate offense involve no other defendants. By the time he comes to trial here, virtually all of the rest of the case will have been completed. Had the court not severed this indictment, all fourteen defendants would still now be awaiting trial, more than fourteen months after their indictment.

### V. *Conclusion*

Motions on grounds of misjoinder are denied. Motions for severance are granted

 

in part and denied in part, as indicated above.

So ordered.