IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 12, 2022 Session

## STATE OF TENNESSEE v. GLENN ROBY, JR., AND KEVYN DESHAWN ALLEN

**Appeal from the Criminal Court for Davidson County**
**No. 2016-C-1716     Steve Dozier, Judge**

_____

**No. M2020-00301-CCA-R3-CD**

_____

A Davidson County Criminal Court Jury convicted the Appellants, Glenn Roby, Jr., and Kevyn Deshawn Allen, of first degree premeditated murder, and the trial court sentenced them to life in confinement.  On appeal, Roby contends that the trial court erred by allowing proof of a robbery and shooting that occurred just hours prior to the events in this case, that the trial court erred by allowing the State to play portions of a witness's recorded interview for the jury as a prior inconsistent statement, that the trial court erred by denying his petition for a writ of error coram nobis, and that he was denied his right to subpoena witnesses. Allen contends that the evidence is insufficient to support his conviction and that the trial court erred by denying his severance motion.  In addition, both Appellants contend that the trial court erred by allowing inflammatory crime scene and autopsy photographs into evidence.  Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.[1]

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Sam E. Wallace, Jr. (on appeal), and David Hopkins (at trial), Nashville, Tennessee, for the appellant, Glenn Roby, Jr., and David A. Collins (on appeal and at trial), Nashville, Tennessee, for the appellant, Kevyn Deshawn Allen.

Herbert H. Slatery III, Attorney General and Reporter; Richard Davidson Douglas, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela Anderson and Chandler Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Oral arguments were made only on behalf of Appellant Allen.

## OPINION

## I. Factual Background

In the early morning hours of January 3, 2016, a man walking his dog found the body of the victim, Adrin Ohaekwe, lying in a yard on Old Smith Springs Road in Nashville.[2] He had been shot multiple times. The previous evening, the victim and one of the Appellants, Roby, allegedly had committed a robbery and shooting in Smyrna. The State theorized that Roby, with Allen's assistance, killed the victim in order to prevent Roby's apprehension for the prior robbery and shooting.

In September 2016, the Davidson County Grand Jury returned a three-count indictment, charging the Appellants in count one with the first degree premediated murder of the victim; charging MacKenzie Aleese Colling in count two with being an accessory after the fact; and charging Colling in count three with tampering with evidence. Colling's case was severed from that of the Appellants, and the Appellants were tried jointly in October 2018.

At trial, Tamera Hawkins, the victim's mother, testified that in January 2016, the victim was living on Seton Court in Smyrna and was in a relationship with Joy Gause. The victim's birthday was January 3, so Hawkins and her daughters took a birthday present to the victim on January 2. That was the last time Hawkins saw the victim alive.

Twenty-two-year-old Dallas Padgett testified that in January 2016, he was a college student but was "back home in Smyrna for Christmas break." Padgett knew the victim because they played basketball together and casually exchanged marijuana. Padgett also sold marijuana. On the evening of January 2, Padgett was at a friend's house and was supposed to sell a quarter pound of marijuana to the victim. The victim arrived at the house about 6:00 p.m. He entered the house alone and went into the back bedroom with Padgett and two of Padgett's friends. The marijuana was in the bedroom, and the victim showed Padgett the money for the drug deal. The victim saw a pair of shoes in the bedroom and said that his "cousin" may want to buy them. The victim, Padgett, and Padgett's two friends went to the front door of the home, and Roby came inside. Padgett said he had never seen or heard of Roby prior to that day, and he identified Roby in the courtroom.

Padgett testified that the five of them went into the back bedroom and that "[t]he next thing I remember was the door, as in the bedroom door, being reopened. And immediately the first thing I saw was a pistol in the corner of the door, immediately fired off in the corner at no one." The shooter then fired five shots at Padgett, striking him in

---

[2] During trial, the victim often was referred to as "Adrian." However, the victim was named in the indictment as "Adrin Benjamin Ohaekwe," and the record confirms that his first name was "Adrin."

the chest. Padgett said that he saw the shooter and that he was "100 percent" sure the shooter was Roby. The State asked if Roby or the victim said anything prior to the shooting, and Padgett stated, "In the heat of the moment, maybe like 'give me that [sh*t]' or 'come up off' or something, just yelling." After the shooting, Roby and the victim ran out of the house. Padgett said he thought they took the marijuana. Padgett's two friends drove him to StoneCrest Medical Center in Smyrna, and he was "life flighted" to a Nashville hospital where he spent fifteen days.

On cross-examination by counsel for Roby, Padgett acknowledged that he was charged with selling marijuana but that he "got out of those charges." At the time of the Appellant's trial, though, a charge of simple possession was pending against Padgett. Padgett acknowledged that he had sold marijuana to the victim multiple times prior to January 2 and that he and the victim exchanged text messages about the drug deal that was supposed to occur on January 2. Padgett never saw Roby outside prior to the shooting and robbery.

Officer Christopher Rowlett of the Smyrna Police Department (SPD) testified that on January 2, 2016, he helped process the crime scene in which Dallas Padgett had been shot. Officer Rowlett collected a projectile and five shell casings. One casing was outside on the street, and four casings were in the bedroom.

Gary Walker testified that he lived in Nashville on Old Smith Springs Road, which he described as "an older street that has approximately eight houses on it, very little traffic and it's a dead end." About 3:30 or 4:00 a.m. on January 3, 2016, Walker was walking his dog and saw a pair of shoes. He then saw "a body in [a] driveway." Walker did not check to see if the person was alive but noticed frost on the back of the person's jacket. Walker called 911.

Officer Leonard Spadavecchia of the Metropolitan Nashville Police Department (MNPD) testified that he responded to Old Smith Springs Road and saw "a deceased male black at the base of a driveway right off the street." Four shell casings were around the body. Officer Mark Rosenfield of the MNPD testified that he photographed the crime scene and that the deceased male was lying on the ground with his feet toward the road and his head toward a home. A cellular telephone was in his left hand. Officers found a projectile in the ground underneath the body but did not find a weapon.

Officer Ken Wolfe of the MNPD testified that he responded to Old Smith Springs Road and prepared a crime scene diagram. The deceased man had gunshot wounds to his head and face, and four nine-millimeter shell casings were around his body. When the medical examiner's officer removed the body from the scene, officers noticed "a very definite defect under the body." They "started digging" in the ground and found a projectile. Detective Gregory Jennings of the MNPD testified that no identification was on the body. A cellular telephone was in the deceased man's left hand, so Detective

- 3 -

Jennings obtained the number for the telephone to try to identify him. The telephone number was xxx-xxx-3213.

Brian Blaylock testified that in January 2016, he was the Human Resources Manager for Interstate Warehousing in Murfreesboro. Roby and the victim worked for the company as material handlers and forklift operators and were "acquaintances." At law enforcement's request, Blaylock reviewed video surveillance for Interstate Warehousing that was recorded on the night of January 2, 2016. Blaylock said the video showed that Roby entered the building and was inside about twenty minutes. Roby spoke with another employee, exited the building, and appeared to be carrying something "wadded up." Blaylock said that the video did not show the victim in the building but that Blaylock "heard that he was in the parking lot at the time." Blaylock stated that video of the parking lot showed that after Roby left the building, a man walked up to another man who was standing beside a black sedan. However, Blaylock could not identify the men as Roby and the victim.

Sharon Tilley of the MNPD's Crime Laboratory testified that in January 2016, she processed a red Nissan Altima and swabbed the car for fingerprints and DNA. She did not see any blood in the vehicle but found identification for Victoria Robertson and Kevyn Allen.

Joy Gause testified that in January 2016, she and the victim had been in a romantic relationship for more than two years and were living on Seton Court in Smyrna. Gause met Roby for the first time on her birthday in November 2015. The victim and Roby worked together at Interstate Warehousing, and the victim owned a white iPhone.

Gause testified that on the night of January 2, she received telephone calls and text messages from the victim. The calls and texts did not come from the victim's iPhone but from two different numbers Gause did not recognize: xxx-xxx-4767 and xxx-xxx-3213. Gause said the calls "were kind of hard to hear" and explained, "I don't know if he was trying to be low about what he was saying because he was acting as if he was scared and stuff like that. So I really couldn't -- the reception . . . was bad." She said that she and the victim talked "off and on" that night and that the police kept "coming back and forth to the house looking for certain individuals." Gause told the victim that she was being "harassed" by the police.

Gause identified "screen shots" of her telephone for the jury, showing the calls and texts she received from the victim. Between 8:03 p.m. and 9:48 p.m., the victim called Gause five times from xxx-xxx-4767. Later that night, she went to the SPD and provided officers with information in her telephone. She and an officer used her telephone to try to call the victim at xxx-xxx-4767, but he did not answer. At 11:55 p.m., Gause received two text messages from xxx-xxx-3213. The first message read, "Wassup baby girl." Gause said she knew the victim sent the message because he used to refer to her as "baby girl."

The second message read, "Call me this yo [n*gga]." Between 11:54 p.m. on January 2 and 12:03 a.m. on January 3, which was the victim's birthday, Gause had four "missed calls" on her telephone from xxx-xxx-3213. At 12:08 a.m., she had a missed call from xxx-xxx-4767. Gause left the SPD in the early morning hours of January 3. At 1:18 a.m., she texted the victim at xxx-xxx-3213, but he did not reply. She kept texting him at that number but never heard from him.

Detective Rick Hall of the SPD testified that on January 2, 2016, he learned that someone had been taken to StoneCrest Medical Center in Smyrna with a bullet wound to the chest. Detective Hall went to the house where the shooting had occurred and spoke with witnesses. Officers collected shell casings and a projectile at the scene. Detective Hall looked in a cellular telephone related to the Smyrna case and learned that the drug deal had originated on Seton Court. He went to Seton Court and met with Joy Gause, who was "kind of cooperative in the beginning." He then went to Interstate Warehousing because Roby and the victim were employed there.

Detective Hall testified that Gause's cellular telephone number was xxx-xxx-4038. In the early morning hours of January 3, he used her telephone to speak with the victim and Roby. He spoke with the victim at 12:44 a.m. and told the victim that he knew the victim was involved in the Smyrna shooting. He also told the victim that Gause "was tied up in this now" and that the victim should come to the SPD to "tell his side of the story." Detective Hall spoke with Roby at 12:47 a.m. for eight minutes. He told Roby that Roby had been identified in a "photo lineup" and that warrants had been issued for Roby's and the victim's arrests. Roby denied being involved in the Smyrna incident and was "argumentative." He claimed that he had never been to Smyrna and that he had been with his girlfriend all night. Detective Hall told Roby that he needed to come to the SPD and that "you're going to see yourself on the news in the morning if you don't come in and see me." Roby said he was going home and hung up on Detective Hall, so Detective Hall issued a media release about the Smyrna shooting because Roby and the victim "were still together" and were considered "armed and dangerous." The media release included photographs and descriptions of Roby and the victim.

Detective Hall testified that at 11:00 a.m. on January 3, Roby came to the police department and turned himself in. Roby's father and MacKenzie Colling, who was Roby's girlfriend, were with him, and Detective Hall interviewed all three of them. Roby maintained that he was with Colling the previous night and that he did not know anything about the Smyrna shooting. The next day, officers with the SPD and the MNPD began to suspect that the Smyrna shooting and the victim's death were related. Detective Hall provided the shell casings and projectile collected in Smyrna to the MNPD so that the evidence could be compared with the evidence found on Old Smith Springs Road.

Detective Hall testified that on January 8, he executed a search warrant at the home of Roby's parents in Spring Hill. Roby's mother's car, which officers suspected had been

used in the crimes, was in the garage and had been "professionally cleaned." Detective Hall described the car as a "bluish gray" four-door sedan. He looked for a semi-automatic pistol during his search of the home but did not find one. Roby's cellular telephone had been disassembled, but Detective Hall was able to find all of the pieces and put the telephone back together.

On cross-examination by counsel for Roby, Detective Hall acknowledged that he did not find any nine-millimeter ammunition during the search. Roby's mother told Detective Hall that her car had been "washed." Roby was still in jail at the time of the search, and nothing indicated that he had been responsible for having the car cleaned. When Detective Hall spoke with Roby on the telephone in the early-morning hours of January 3, he did not tell Roby that the victim was being cooperative in the Smyrna investigation. Detective Hall acknowledged that it was not unusual for suspects like Roby to be uncooperative with the police.

Twenty-four-year-old Rebekkah Barrett testified that in January 2016, she had just transferred to Middle Tennessee State University (MTSU) and was living in an apartment in Murfreesboro with several other women. About 9:00 p.m. on January 2, Barrett came home to find "a bunch" of men and women she did not know in her living room. She said that they were "smoking weed and hanging out" and that she went into her bedroom and shut the door. She then heard "a guy start rapping" and heard him say that he was going to "shoot somebody." Barrett fell asleep and did not know when the people left. The next morning, she saw information in the newspaper about the Smyrna shooting. A photograph of one of the suspects looked like one of the men she had seen the previous night.

Barrett testified that none of the men in her apartment introduced themselves to her, so she did not know their names. She went to the police department, and officers showed her some photographs. Barrett selected Roby's photograph and identified him as one of the men who had been in her apartment. Barrett acknowledged that she also identified the victim as being present.

On cross-examination by counsel for Roby, Barrett acknowledged that she could not say definitively that Roby was in her apartment on January 2. On redirect examination, though, she testified that she "definitely remember[ed]" him being there. She also said she thought he was the man who was rapping.

Joseph Williford testified that he was the Loss Prevention Manager for the Walmart on South Rutherford Boulevard near MTSU in Murfreesboro. At law enforcement's request, Williford obtained still images from store surveillance video and obtained cash register transactions for January 2, 2016. The images showed that at 10:24 p.m., two African-American men were in the sporting goods area where rifles, shotguns, and ammunition were displayed. Williford explained to the jury that guns and ammunition could not be obtained for purchase without the help of a Walmart employee. The images

- 6 -

showed that at 10:28 p.m., an assistant manager obtained a one-hundred-count box of nine-millimeter ammunition for the men and took it to a cash register. At 10:30 p.m., one of the men paid $40 cash for a bag of oranges and the box of ammunition. He received $17.16 change. At 10:38 p.m., a second purchase was made for a Huawei cellular telephone and forty-dollars-worth of prepaid calls. The cost of those items was $77.79, and the buyer paid with $100 cash. On cross-examination, Williford acknowledged that he did not know the brand of ammunition purchased.

MacKenzie Colling testified that in January 2016, she was nineteen years old and was living in Spring Hill with her parents. She had been dating Roby for about one and one-half years. Roby lived in Spring Hill with his parents and worked at Interstate Warehousing. Colling knew the victim and Kevyn Allen from Interstate Warehousing, and Roby would refer to Allen as "Kev." Roby owned a tan and black nine-millimeter handgun, and he would carry it with him whenever he left his house. Colling last saw the gun at Roby's house on January 1, 2016.

Colling testified that on January 2, she worked as an assistant manager at Finish Line in Cool Springs and went shopping with her sister after work. Colling got home about 9:00 p.m. and was there all night with her parents and siblings. She communicated with Roby via text messages that day, but she did not see him. Roby did not mention the victim in his texts. At 1:23 a.m. on January 3, Colling received a text message from xxx-xxx-4767, which was Roby's telephone number. The message read:

> Omw[3] back yes…if anyone ask jus say u were with me till 1030..they ask what we did we went on a date..they ask where it's none of there business..tell them that…period...DONT EVER CHANGE THE STORY I JUS GAVE U….u dropped me off at kevs because I didn't have a car and u went home period ok?

Colling responded that she would help Roby.

Colling testified that about 6:00 a.m. on January 3, she agreed to meet Roby at the Kroger in Spring Hill. She told the jury that it was not unusual for them to meet after he finished working the night shift at Interstate Warehousing. Roby asked Colling to drive by his house to see "if there [were] any suspicious vehicles like parked cars near his house or anything [was] out of normal." Colling drove by the house but did not see anything unusual, and she met Roby in the Kroger parking lot. He was driving his mother's Ford Focus and was wearing a white t-shirt and camouflage pants. At that point, the State showed Colling a still image of a man wearing camouflage pants in Interstate Warehousing on the night of January 2 and a still image of the two men who were in Walmart on the night of January 2. Colling identified the man in Interstate Warehousing as Roby and

---

[3] Colling said that "Omw" meant "on my way."

identified the men in Walmart as Roby and the victim. Colling noted that in both images, Roby was wearing a distinctive red jacket with white sleeves. However, he was not wearing the jacket when she met him in the Kroger parking lot on January 3.

Colling testified that Roby was acting "weird" at Kroger and that she asked him what was going on. He told her that he took the victim to a friend's house and that the victim went inside. Roby claimed that he went to the door of the home and heard gunshots and that he and the victim ran back to Roby's car and drove away. Roby also claimed that he dropped off the victim at the victim's house and that Roby went to Allen's house.

Colling testified that Roby asked her to drive his mother's car, so she drove the Ford Focus to Roby's parents' house and parked it in the garage. Roby followed in Colling's maroon Monte Carlo. They went into Roby's bedroom, and Roby undressed to take a shower. After the shower, Roby turned on the television and saw a news story that said he and the victim were "wanted" for the Smyrna shooting. Colling said that Roby "was kind of freaking out," that he got dressed, and that he talked with his parents. At some point, Colling saw Roby near a trashcan at the home. She later looked in the trashcan and saw three pairs of "camo" pants and a couple of shirts.

Colling testified that Roby turned himself in to the SPD and that she and Roby's father went with him to the police department. She acknowledged that she was charged with crimes related to this case and that she entered into a "use immunity agreement," meaning that her statement to the police could not be used against her. She also acknowledged that she did not have an agreement with the district attorney's office about her case but that she was hoping to receive "favorable" treatment in exchange for her truthful testimony.

On cross-examination by counsel for Roby, Colling testified that she did not know the difference between a nine-millimeter firearm and a forty-caliber firearm. However, Roby told her that his gun was a nine-millimeter. On the morning of January 3, Colling did not see anything unusual in the Ford Focus and did not see any blood or dirt on Roby's clothing. She also did not see any guns or ammunition in Roby's bedroom. Colling denied lying to the police but said she "didn't tell them everything." She acknowledged that she did not tell the police about the clothing in the trash can.

Victoria Robertson testified that she and Allen dated for six years. At the time of trial, they were still in contact and had a close relationship. Robertson acknowledged that she was testifying under subpoena and that she was required to testify truthfully.

Robertson testified that in January 2016, she and Allen were living in an apartment in Murfreesboro and that Allen worked at Interstate Warehousing as a forklift operator. Allen and Roby were friends, and Roby would come to their apartment weekly. On the evening of January 2, Robertson and Allen were at home. About 11:30 p.m., Roby and the

victim arrived. Robertson had never met the victim previously. The three men sat on the couch and were laughing, talking, and watching television. Robertson acknowledged that while Roby and the victim were at her apartment, Allen told her that the victim had made statements about a robbery to people at Interstate Warehousing.

Robertson testified that she was in her bedroom but decided to go to McDonalds about 12:30 a.m. She went into the living room and discovered that Allen, Roby, and the victim were gone. Robertson looked outside and noticed that her red Nissan Altima also was gone. She telephoned Allen, and he told her that he was driving the victim to the victim's father's house near MTSU. Robertson telephoned Allen again at 1:25 a.m., and he telephoned her at 1:30 a.m. Allen said he was at the Kangaroo Mart near their apartment. Allen drove back to their apartment, and Robertson saw him and Roby get out of her car. Roby told Robertson that "we just dropped Adrian off at his dad's house and had a drink with him. It's his birthday." Robertson said Allen and Roby were acting "[f]ine, normal."

Robertson testified that when she went to bed, Roby was sitting on her couch and was watching television. He was gone when she got up the next morning. Robertson later saw a news story about the victim and went to the police department. She told the police about Allen, Roby, and the victim leaving in her car and about Allen and Roby returning in her car.

Several witnesses who lived on or near Old Smith Springs Road testified about hearing gunshots in the early morning hours of January 3, 2016. Brenda Hiter described the shots as "[b]ang, bang, bang, bang." She said that she looked out her window, that she saw a "sedan" in front of her house, and that the car drove away "[k]ind of quick." Hiter saw something in her yard and thought someone had "dumped their Christmas tree." Andy Jennette, who lived "two doors up" from Hiter, testified that he was watching television when he heard "three or four gunshots back to back and then one about a second or two later by itself." Jennette looked out his front window and went outside but did not see anything. Patricia Miller testified that she was awakened by "the sound of a pop, pop, pop, pop, and then a delay and then pop." She looked at her digital clock, and it read "1:05." Afeef Alhalhasam testified that he was awakened by "three or four pops." The time on his clock was 1:05 a.m. Christopher Jacobs testified that he was awakened by six or seven "bangs" that were in "very quick succession." He then heard a car drive away at a high rate of speed. He described the time as "just a few minutes after one in the morning."

Detective Donald Christopher Barr of the MNPD testified that he was the lead investigator in the victim's death and went to Old Smith Springs Road. The victim's body was still present, and a cellular telephone was in his left hand. Detective Barr found $81.18 on the body, but he did not find a wallet or identification. Detective Barr returned to the police department with the cellular telephone in order to try to identify the victim and learned that the number for the telephone was xxx-xxx-3213. However, he was unable to learn the victim's identity from the telephone.

Detective Barr testified that he found out about the Smyrna crimes and "was able to find a Facebook account belonging to Mr. Ohaekwe." He compared the Facebook photographs to the photographs of the body found on Old Smith Springs Road and noticed that the two men had similar features. However, he could not positively identify the body as Ohaekwe. Detective Barr ultimately learned that the victim was Ohaekwe from fingerprints taken during the victim's autopsy. After Detective Barr confirmed the victim's identity, he contacted Detective Hall of the SPD. The two officers met on January 4, and Detective Barr found out that Roby had turned himself in to the SPD.

Detective Barr testified that he met with Roby at 9:13 p.m. on January 4. Roby waived his rights, and Detective Barr questioned him. The State played an audio-recording of the interview for the jury. During the interview, Roby claimed that he gave the victim a ride to a house in Smyrna on January 2. Roby waited in the car while the victim went inside the house. Roby heard gunshots, and the victim came back to the car. The victim was not wearing any shoes. Roby stated that the victim "either ran out of his shoes or - something happened with his shoes." Roby gave the victim a pair of Roby's black work boots and dropped off the victim on Century Court in Smyrna about 7:30 p.m. Roby was supposed to work at Interstate Warehousing that night but was so upset about what had happened in Smyrna that he went to Interstate Warehousing and told his supervisor that he needed "personal time." Roby went out with his "chick," MacKenzie Colling, and was with her until 11:30 p.m. He then went to a friend's house, was there until 6:20 a.m., and went home. At that point in the interview, Detective Barr told Roby that the victim was dead and that the victim had been "shot and left on the side of the road." Roby claimed he did not have anything to do with the victim's death.

Detective Barr testified that the victim had three gunshot wounds on the right side of his face. The victim was found wearing a "very distinctive" black hoodie with animal-print sleeves, "AKOO" across the front of the hoodie, and "80" on the back of the hoodie. After Roby's interview, Detective Barr went to Interstate Warehousing and obtained surveillance video to verify that Roby had been there on the night of January 2. The video showed that both Roby and the victim had been at Interstate Warehousing. Detective Barr recognized the victim in the video because the victim was wearing the distinctive black hoodie. Detective Barr never found the victim's white iPhone.

Detective Barr testified that he interviewed Rebekkah Barrett on January 6 and that she was very cooperative. The State played two brief portions of Barrett's audio-recorded interview for the jury. During the interview, Barrett told Detective Barr that the victim and Roby had been in her apartment on the night of January 2 and that she "totally recognized [Roby's] face."

Detective Barr testified that on January 8, he interviewed Roby's girlfriend, MacKenzie Colling. Although Colling was not cooperative, she said she was not with

Roby on the night of January 2. Detective Barr later interviewed Colling with her attorney present, and Colling was cooperative. Detective Barr was present when the police searched Roby's parents' home on January 8, and Detective Barr interviewed Roby's parents.

Detective Barr testified that based on witness information and surveillance video from Interstate Warehousing, Walmart, and the Kangaroo Mart, he put together the following timeline: After the incident in Smyrna, Roby and the victim went to Interstate Warehousing. Still images of the parking lot showed them standing by a car, and the victim was wearing socks but no shoes. Later, the victim could be seen carrying a black object in the parking lot and putting on black boots. Roby, wearing his red and white jacket, went into Interstate Warehousing and appeared to be "relatively agitated during that time because he was pretty animated when he was talking. And [he] had hit the wall a couple of times too with his fist." Roby and the victim left Interstate Warehousing soon after 9:00 p.m. and ended up at Rebekkah Barrett's apartment.

From there, Roby and the victim drove to Walmart, "which [was] basically just right across the street." Roby's mother's Ford Focus pulled into the Walmart parking lot at 10:21 p.m., and Roby and the victim entered Walmart at 10:22 p.m. Roby was still wearing the red and white jacket, and the victim was wearing the black hoodie with animal-print sleeves. The victim paid cash for oranges and ammunition at 10:30 p.m., and the victim walked away from the register with the oranges while Roby "end[ed] up taking the bag with the ammunition in it." At 10:38 p.m., the victim returned to the register and purchased the Huawei cellular telephone that was found in his left hand on Old Smith Springs Road. Roby and the victim walked outside to the Ford Focus at 10:40 p.m., and Roby took off the red and white jacket and put it in the trunk of the car. He and the victim left Walmart in the Focus at 10:42 p.m. At 1:29 a.m. on January 3, Roby was at a cash register in the Kangaroo Mart. He was not wearing the red and white jacket and appeared to be smiling. Roby walked outside to a car that appeared to be Victoria Robertson's Nissan Altima, which was parked at a gas pump. He got into the passenger side while another person pumped gasoline into the car.

Detective Barr testified that he obtained the five shell casings and the projectile found in Smyrna and that he requested they be compared to the four shell casings and the projectile found on Old Smith Springs Road. He also obtained text messages sent to and from Roby's telephone number, xxx-xxx-4767, from January 1 to January 3, 2016. Detective Barr identified the text messages for the jury, and we have summarized the relevant messages as follows: At 2:21 p.m. on January 1, the victim's iPhone, with number xxx-xxx-6362, sent a text to Roby's telephone that read, "You still about that lick life?" Detective Barr explained to the jury that "lick" referred to "criminal activity, robbing." At 3:03 p.m., the victim's iPhone sent a text to Roby's telephone that read, "Everything set up." At 3:09 p.m., a text was sent from Roby's telephone to Colling's telephone that read, "I'm Fina go try n make this $ ..I don't trust dude tho ..I love u .. sum happen I was with Adrian ..ok." At 5:23 p.m., a text was sent from Roby's telephone to Colling's telephone

- 11 -

that read, "Imma end up doing something dumb I don't think u should b with me." For the rest of the day, Roby's telephone and the victim's iPhone exchanged texts about committing a robbery.

At 10:09 a.m. the next day, January 2, the victim's iPhone sent a text to Roby's telephone that read, "What happened last night [n*gga?]" Roby's telephone responded, "I fell asleep." At 1:22 p.m., the victim's iPhone sent a text to Roby's telephone that read, "Just seein if you up before I try to set this [sh*t] up." Texts from Roby's telephone responded, "Yea. .same dude?" and "For how much[?]" The victim's iPhone responded, "Qp." Detective Barr said "Qp" meant "quarter pound." From 1:34 p.m. to 5:31 p.m., Roby's telephone and the victim's iPhone continued to exchange texts about an upcoming robbery. At 5:52 p.m., Roby's telephone sent a text to the victim's iPhone that read, "I'm outside." Roby's telephone also sent a text to a different telephone number that read, "I'm in the buro." Detective Barr said that he never learned to whom the telephone number belonged but that "boro" was a common nickname for Murfreesboro.

At 6:08 p.m., the victim's iPhone sent a text to Roby's telephone that read, "I don't know bout them white boys tho after all this."[4] At 7:17 p.m., Roby's telephone sent a text to the victim's iPhone that read, "See if he'll sell me a quarter." Twelve minutes later, Roby's telephone sent another text to the victim's iPhone that read, "So how u gonna get out or me in?" Detective Barr acknowledged that the message was sent about the same time as the robbery and shooting in Smyrna.

At 9:28 p.m., Allen's telephone sent a text to Roby's telephone that read, "Wassup bru." At 9:51 p.m., Allen's telephone sent a second text to Roby's telephone that read, "U str8 . . . .wer ya at bru." Roby's telephone responded, "Tryna get this green off." At 10:01 p.m., Roby's telephone sent a text to Joy Gause's telephone that read, "This is Adrin call me back." At 10:15 p.m., Roby's telephone sent a text to Allen's telephone that read, "I'm OMW." Detective Barr said "OMW" meant "on my way." Roby's telephone then sent a text to another unknown telephone number that read, "Going to kev house [to] get [off] the streets."

At 10:28 p.m., Roby's telephone sent a text to Allen's telephone that read, "I need a favor …I'll give you a whole zip bro." Allen's telephone responded, "Wat it is." At 10:29 p.m., Roby's telephone sent a text to Allen's telephone that read, "I gotta get rid of this [n*gga] Adrian. ..I can't drive…I'm tryna get him drunk right now." At 10:30 p.m., Allen's telephone sent a text to Roby's telephone asking, "What u want me 2 do[?]" Roby's telephone responded, "I m Fina get sum more 2 drink n slide on u eventually gotta convince him I got sum hoes somewhere somewhere where it s isolated n he can get out I m in Walmart right now getting shells." Detective Barr acknowledged that the Walmart video showed that the victim was purchasing the box of ammunition while Roby appeared

---

[4] The record reflects that Dallas Padgett was white.

to be texting. At 10:35 p.m., Allen's telephone responded, "Lol sure let me kno wat da plan is …." At 10:39 p.m., Roby's telephone sent a text to Allen's telephone that read, "I'm omw." At 11:06 p.m., Colling's telephone sent a text to Roby's telephone that read, "Wyd at kevs." Detective Barr said that "Wyd" meant "what you doing." At 11:22 p.m., Roby's telephone sent a text to an unknown number that read, "U know anywhere in the buro? I'm getting him drunk his bday 2ma …I need a spot tho." Six minutes later, Roby's telephone sent a text to Colling's telephone that read, "Baby if anyone ask or anything I was with u baby till about 10 30 ..ok?"

At 11:37 p.m., Roby's telephone sent a text to Allen's telephone that read, "He told detectives looking for me at work." At 11:38 p.m., Allen's telephone responded, "I kno u 4real [n*gga]….just let me [kno] wat da plan is." At 11:39 p.m., Allen's telephone sent a text to Roby's telephone that read, "Who he tell dat [sh*t] 2?" Roby's telephone responded, "His chick prolly." At 11:40 p.m., Roby's telephone sent a text to the victim's iPhone that read, "Cardo n Greg call say detectives called n asked what car n where I stay n how." At 11:48 p.m., Roby's telephone sent two texts to Allen's telephone that read, "I kno" and "That I got a Saturn car n live in Franklin..both ain't true." At 12:39 a.m. on January 3, Allen's telephone sent two texts to Roby's telephone that read, "[A]n y da [f*ck] he would do sum [sh*t] like dat 4 neway" and "How u find dat [sh*t] out[?]" At 1:21 a.m., Colling's telephone sent a text to Roby's telephone that read, "U still at kevs[?]" Two minutes later, Roby's telephone sent the text to Colling in which he asked her to provide him with an alibi.

On cross-examination by counsel for Roby, Detective Barr testified that the text messages appeared to discuss two different robberies: one on January 1 and one on January 2. However, the January 1 robbery "didn't go through." Detective Barr said that he did not know what brand of ammunition the victim bought at Walmart and that there was no way to determine from the crime scene what time the victim was killed. The police never found the victim's white iPhone, but records for the iPhone showed that it was not used after the Smyrna robbery. On cross-examination by counsel for Allen, Detective Barr acknowledged that none of the text messages exchanged between Allen and Roby discussed what happened on Old Smith Springs Road. On redirect-examination, Detective Barr testified that from the text messages exchanged between Roby and Allen, it sounded like the "plan" was to get the victim "drunk" and get the victim somewhere "isolated." Detective Barr acknowledged that Old Smith Springs Road was an "isolated" location.

Detective Joseph High of the MNPD's Surveillance and Investigative Support Unit testified as an expert in call detail record analysis that he obtained the call detail records for the cellular telephones associated with Roby, the victim, Allen, and Colling. He also obtained the call detail records for the cellular telephone purchased by the victim at Walmart. Based on the use of the telephones and their communications with different cell service towers in the early morning hours of January 3, Detective High was able to determine the approximate locations of the telephones.

Detective High testified that between 12:02 and 12:28 a.m., the Walmart telephone was stationary and was near Old Fort Parkway in Murfreesboro. Roby's and Allen's telephones were in the same area. From 12:34 to 12:40 a.m., the Walmart telephone traveled northwest on Interstate 24 from Murfreesboro toward Nashville. At 12:39 and 12:41 a.m., Roby's telephone also was traveling northwest. At 12:42 a.m., the Walmart telephone made an outgoing voice call to Joy Gause's telephone. The duration of the call was three minutes, seven seconds, and the call was the "last location event" for the Walmart telephone. During that call, the Walmart telephone was traveling toward Old Smith Springs Road. At 12:48 a.m., Roby's telephone received an incoming voice call from Gause's telephone. The duration of the call was eight minutes, forty-one seconds. During the call, Roby's telephone traveled from Interstate 24 toward Old Smith Springs Road. At 1:15 a.m., Roby's telephone made an outgoing call to Colling's telephone in Spring Hill. By that time, Roby's telephone had traveled away from Nashville and back toward Murfreesboro. At 1:26 a.m., Allen's telephone also was traveling away from Nashville and toward Murfreesboro on Interstate 24. At 1:30 a.m., Allen's telephone was near Old Fort Parkway in Murfreesboro.

Ryan Kent of the MNPD Crime Laboratory testified as an expert in firearms and toolmark identification that he performed microscopic analysis on the five nine-millimeter shell casings collected in Smyrna; the projectile collected in the bedroom in Smyrna; the four nine-millimeter shell casings collected in Nashville; and the projectile collected underneath the victim's body in Nashville. He then compared the evidence in both cases. Kent concluded that the two projectiles were fired from the same weapon and that all nine of the shell casings were fired from the same weapon. However, without the firearm involved in the shootings, he could not say the projectiles were fired from the same weapon as the shell casings.

Dr. Adele Lewis, who was the Deputy Medical Examiner for Davidson County in January 2016, testified as an expert in forensic pathology that she performed the victim's autopsy on January 4. The victim's body was fully clothed and was wearing socks and black boots when it arrived at the medical examiner's office.

Dr. Lewis testified that the victim was shot at least ten times and that holes in his clothing were consistent with the gunshot wounds to his body. Three bullets entered the right side of his face, five bullets entered his right arm and shoulder, and two bullets entered the upper right side of his back. The gunshots to the victim's back caused the most significant injuries and were probably fatal. Those bullets damaged his skin and soft tissues; broke one of his ribs; damaged his lungs; and damaged his aorta and vena cava, the major blood vessels in his chest. In addition to the victim's ten gunshot wounds, he had a gunshot graze wound on his chin, a gunshot graze wound on the back of his neck, and an abrasion on the left side of his head. Dr. Lewis said the abrasion could have occurred from the victim's falling onto the ground.

- 14 -

Dr. Lewis testified that she found stippling around one of the gunshot wounds to the victim's face, meaning that the end of the muzzle of the gun was three inches to three feet away from the victim when the gun was fired. She did not find any soot or stippling around the other nine wounds, but the victim's clothing could have prevented soot or stippling from being deposited onto his skin. Dr. Lewis said that she did not find any defensive wounds on the victim and that it was possible someone was standing over him when he was shot. She concluded that the victim's cause of death was multiple gunshot wounds and that his manner of death was homicide. On cross-examination by counsel for Roby, Dr. Lewis testified that she could not determine the sequence of the gunshot wounds.

At the conclusion of Dr. Lewis's testimony, the State rested its case. The Appellants did not present any proof, and the jury convicted them as charged of first degree premeditated murder. The trial court immediately sentenced them to life in confinement.

## II. Analysis

### A. Smyrna Robbery and Shooting

First, Roby claims that the trial court erred by allowing the State to present proof about the Smyrna robbery and shooting because the evidence was inadmissible under Tennessee Rule of Evidence 404(b).[5] The State argues that the trial court did not err. We agree with the State.

Twelve days before trial, the State filed a motion to introduce evidence of Roby's "planning, participation, and attempt to conceal involvement" in the Smyrna crimes. In the motion, the State asserted that the evidence was relevant to show his identity and motive in killing the victim. The trial court held a hearing on the motion four days before trial. During the hearing, Dallas Padgett testified about the Smyrna robbery and shooting, and MacKenzie Colling testified about Roby's owning a tan and black handgun, the texts they exchanged on the night of January 2, and her being with him on the morning of January 3. Detective Hall testified about his investigation of the Smyrna crimes, Detective Barr testified about his investigation of the victim's death, and Detective High testified about

---

[5] We note that Roby's single-spaced, six-page brief does not comply with Rule 27(a), Tennessee Rules of Appellate Procedure. The "Statement of the Facts" section for his four-day trial is just five sentences in length. The "Argument" section spans just three pages and does not include any citations to the record. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Nevertheless, Roby was convicted of first degree murder and was sentenced to life in confinement. Therefore, we will briefly address the issues raised in his brief. That said, among the issues listed for review in his brief is that the trial court erred by allowing Victoria Robertson to give hearsay testimony. However, Roby did not address that issue in the "Argument" section. Therefore, that issue is waived.

the call detail records for various telephones near the time of the victim's death. The testimony given by the witnesses was similar to their trial testimony. At the conclusion of the hearing, the trial court found clear and convincing evidence that the Smyrna robbery and shooting occurred and that Roby was involved. The trial court also found that Roby's involvement in those crimes was "highly" relevant to his identity, motive, and intent to kill the victim and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, the trial court ruled that the evidence about the Smyrna crimes was admissible at trial. The trial court stated that it would give a limiting instruction regarding the jury's consideration of the evidence.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court complied with the procedures of Rule 404(b).  Moreover, we agree with the trial court that evidence about the Smyrna robbery and shooting was relevant to prove Roby's identity, motive, and intent to kill the victim.  The proof at the hearing and at trial showed that Roby and the victim remained together after the Smyrna crimes and that Roby thought the victim was telling people about what happened in Smyrna.  Less than three hours before the victim's death, Roby sent a text to Allen in which he stated that he needed to "get rid" of the victim and that his plan was to get the victim "drunk" and take him somewhere "isolated."  Before and after Roby turned himself in to the SPD, he claimed that he did not know anything about the victim's death.  Therefore, Roby's identity, motive, and intent to kill the victim were highly relevant to the State's case.  Furthermore, prior to Padgett's trial testimony and again in the final jury charge, the trial court instructed the jury that if the jury found Roby committed the Smyrna crimes, then the jury could consider the evidence only for the limited purpose of determining whether it showed Roby's identity, motive, or intent in the present case.  Thus, we conclude that the trial court did not abuse its discretion by ruling that the evidence was admissible.

### B.  Motion to Sever

In a related argument, Allen contends that the trial court erred by denying his motion to sever his trial from Roby's trial because he was prejudiced by evidence about the Smyrna crimes.  The State argues that the trial court did not err.  Again, we agree with the State.

After the trial court ruled that the Smyrna evidence was admissible, counsel for Allen made an oral motion that Allen's trial be severed from Roby's trial, stating that "I didn't realize the State was going to want to get in all of the gory details of Smyrna."  The trial court noted that it was going to instruct the jury on criminal responsibility and instruct the jury that evidence of another crime applied to one defendant but not the other.  The trial court stated that it was not convinced the Appellants needed separate trials and denied Allen's severance motion.  During the final jury charge, the trial court gave the limiting instruction mentioned in the previous section and then immediately instructed the jurors as follows:

> Such evidence of other crime, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.  You should give separate consideration to each defendant.  Each is [e]ntitled to have his case decided on the evidence and the law which is applicable to that particular defendant.  Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant.

Tennessee Rule of Criminal Procedure 8(c)(1) provides that two or more defendants may be charged in an indictment "if each of the defendants is charged with accountability for each offense included."  Tennessee Rule of Criminal Procedure 14(c)(2)(A) provides that a trial court shall grant a severance of defendants before trial if "the court finds a

- 17 -

severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." However, joint trials are favored "because they promote efficiency and reduce the possibility of inconsistent verdicts." State v. Harbison, 539 S.W.3d 149, 158 (Tenn. 2018) (citing Zafiro v. United States, 506 U.S. 534, 537 (1993)).

"When two or more defendants are charged in the same indictment, evidence that is not necessarily applicable to another defendant may be admissible against one or more defendants." Id. at 159 (citing State v. Meeks, 867 S.W.2d 261, 369 (Tenn. Crim. App. 1993)). Additionally, the introduction of "damaging proof" against one defendant does not mandate severance. Id. As our supreme court has explained,

> There is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant. See United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987).

Id. The denial of a severance motion is reviewed under an abuse of discretion standard, and this court will not find an abuse of discretion unless the denial of the motion resulted in clear prejudice to the defendant. Id.

Here, the Appellants and Colling were charged in a three-count indictment, but Colling and her two counts of being an accessory after the fact and tampering with evidence were severed. Therefore, Roby and Allen went to trial for only one offense, the first degree premeditated murder of the victim. We do not think there was any likelihood of confusion of the charges, and the trial lasted only four days. Granted, much of the State's proof at trial consisted of evidence about the Smyrna crimes. In fact, Allen's name was not even mentioned in the proof until the State's fifteenth witness, Colling, testified. However, the State never alleged that Allen had anything to do with the Smyrna crimes, and the evidence clearly established that he did not become involved in Roby's plan to kill the victim until several hours after the Smyrna incident.

Furthermore, the State sought Allen's conviction for the victim's death based on a theory of criminal responsibility. The State had to prove both Allen's and Roby's intent, and much of the Smyrna evidence would have been admissible against Allen if his trial had been severed from Roby. See Rodriccus Funzie v. State, No. W2019-01491-CCA-R3-PC,

- 18 -

2020 WL 6606408, at *2 (Tenn. Crim. App. at Jackson, Nov. 10, 2020). Allen cannot show prejudice if evidence at his joint trial also would have been admissible at his separate trial. See id. (citing State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992)).

Finally, the trial court instructed the jury that it could consider the State's evidence about the Smyrna crimes only for the limited purpose of determining Roby's identity, motive, and intent and then instructed the jurors that they could not consider the evidence in determining Allen's guilt. Generally, we presume that the jury follows the instructions of the trial court. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Therefore, we conclude that the trial court did not abuse its discretion by denying Allen's severance motion.

## C. Prior Inconsistent Statement

Next, Roby contends that the trial court erred by allowing the State to play portions of Rebekkah Barrett's audio-recorded interview for the jury as a prior inconsistent statement. The State argues that the trial court did not err. We conclude that the trial court erred but that the error was harmless.

During Barrett's testimony, the State asked if any of the men who were in her apartment on the night of January 2 "introduced" themselves to her, and she said no. She stated that the police later showed her photographs of Roby and the victim and that she identified them as two of the men who had been in her apartment because she recognized them at that time. She said, though, that she could no longer say they were in her apartment because "[i]t's just been three years and I don't recognize them now." On redirect-examination, the State showed Barrett her written statement to the police and asked her again if any of the men "introduced" themselves to her on January 2. She responded, "They said hi, but I didn't get anyone's names, no." She acknowledged writing "some names down" in her statement, and the State asked, "Where would you have gotten those?" Barrett answered, "They were from the newspaper article that I read afterwards."

Before Detective Barr's testimony and while the jury was out of the courtroom, the State requested to play two brief portions of Barrett's audio-recorded interview in front of the jury. The State asserted that the recording was admissible through Detective Barr because Barrett's trial testimony was inconsistent with her interview. Specifically, the State asserted that Barrett testified that none of the men introduced themselves to her but told Detective Barr that the victim and Roby "introduced" themselves. The State played the relevant portions of the recording for the trial court. In the recording, Barrett referred to "Adrian." She then asked Detective Barr, "What's the other guy's name? I met him, he introduced himself to me." Detective Barr answered, "Glenn?" Barrett responded, "I totally recognize his face, but I don't remember his first name." Detective Barr then showed Barrett a photograph of Roby and asked if she recognized "that guy." Barrett said yes and that "he was the one that was with Adrian." Both of the Appellants objected to the

State's playing the recording, but the trial court ruled that Barrett's trial testimony was inconsistent with her interview and, therefore, that her interview was admissible under Tennessee Rule of Evidence 613(b). The trial court further found that the statement was made under circumstances indicating trustworthiness and was admissible as substantive evidence pursuant to Tennessee Rule of Evidence 803(26).

During Detective Barr's testimony, he testified about interviewing Barrett on January 6, and the State played the two brief portions of her interview in front of the jury. In its closing argument, the State noted that Barrett "waffled a little bit" in her trial testimony about seeing the victim and Roby on January 2 but that "in her interview with Detective Barr . . . she very clearly identifies Glenn Roby as being the person with [the victim] in her apartment."

Tennessee Rule of Evidence 613 allows the use of prior inconsistent statements to impeach a witness. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." If a party presents a prior inconsistent statement to the witness, the witness "has several possible responses: the witness can admit, deny, or not remember making all or part of the statement." Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[5][a] (6th ed. 2011). If the witness admits making the prior inconsistent statement, extrinsic proof of the statement would be cumulative and, therefore, inadmissible. Id. If the witnesses denies or does not remember making the inconsistent statement, extrinsic proof of the statement is admissible. "[I]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997).

In this case, the State asked Barrett on direct examination if any of the men "introduced" themselves to her, and she said no. On redirect examination, the State presented Barrett's prior written statement to her, and she acknowledged using the Appellants' names in her statement. She then explained that the victim and Roby spoke to her but did not tell her their names and that she learned their names from the newspaper. In other words, the State presented Barrett's prior inconsistent statement to her, she admitted making the statement, and she explained why she did so. Therefore, we do not think that the State should have been allowed to play Barrett's interview or that the interview was admissible pursuant to Tennessee Rule of Evidence 613. In fact, from the State's closing argument, it appears that the State used the recording to bolster Barrett's direct testimony about identifying Roby and the victim on January 6. See Meeks, 867 S.W.2d at 374 (stating that "[p]rior consistent statements are generally inadmissible to bolster a witness's credibility"). In any event, the portions of the interview that the State played for the jury were very brief, totaling just forty-one seconds. Moreover, the

remaining evidence against Roby was overwhelming. Therefore, we conclude that the trial court's error was harmless. See Tenn. R. App. P. 36(b).

## D. Error Coram Nobis

Roby contends that the coram nobis court erred by denying his petition for a writ of error coram nobis. The State contends that the court properly denied the petition. We agree with the State.

Exactly one year after the jury convicted the Appellants, Roby filed a petition for a writ of error coram nobis based upon newly discovered evidence. In the petition, Roby claimed as follows: On the night of the victim's death, the victim met someone named "Rob" at a gas station. Rob later got into a fight with the victim, and Rob sent text messages to the victim before the victim's death. Roby did not know Rob's last name before trial but knew that someone named Rob had worked with the victim at Interstate Warehousing. Roby's attorney tried to find Rob but was unable to do so. After Roby's trial, Roby saw Rob in a Davidson County detention facility and informed his trial attorney of Rob's whereabouts "right away." Roby's trial attorney printed a "booking" photograph of Rob and showed it to Roby, and Roby verified that the photograph was of the man who had been in the fight with the victim. Roby asserted that if he had known Rob's identity before trial, he could have obtained information about the victim's death that would have resulted in a different judgment.

At a hearing on the petition, David Hopkins testified that he began representing Roby at the time of Roby's arraignment and that he represented Roby at trial. About sixty days before trial, Roby gave Hopkins the name of the person who actually shot the victim. The coram nobis court asked how Roby knew the shooter's name, and Hopkins said Roby was present at the shooting. Roby provided Hopkins with the person's first name, Rob, and the name of Rob's employer, Interstate Warehousing, and Mr. Hopkins gave the information to his private investigator. The private investigator contacted Brian Blaylock at Interstate Warehousing, and Blaylock ended up testifying at trial. However, more than fifteen men named "Rob" or "Robert" worked at Interstate Warehousing, and the defense was never able to "narrow that down." Hopkins said that if he had known Rob's last name before trial, he "would have taken further steps." He did not consider contacting the police.

Hopkins testified that Roby was taken back to jail after the jury announced its verdict. Roby's father contacted Hopkins and told him that Rob had been "booked" into the jail and was in the cell next to Roby. Hopkins looked at the sheriff's department website and found Rob's photograph. Hopkins's investigator showed the photograph to Roby, and Roby identified Rob as the man who actually shot the victim. The coram nobis court asked Hopkins why Roby was with Rob and the victim at the time of the shooting, and Hopkins answered, "Um, he knew him from work and there was, I think, maybe going to be a

robbery, I don't know." Hopkins said Allen "was simply driving them there and I don't think [he] knew much about what was going to go on."

Hopkins testified that Rob turned out to be a white male named Robert McMahon. The coram nobis court asked if Hopkins ever verified that McMahon worked at Interstate Warehousing, and Hopkins answered, "I don't recall if we got that far." Hopkins spoke with McMahon's attorney but ended up withdrawing from Roby's case. Upon questioning by the coram nobis court, Hopkins acknowledged that if Roby had tried to blame Rob McMahon for shooting the victim, Roby may have had to admit he was present when the victim was killed and may have been charged with first degree felony murder. Hopkins said he did not know if the victim's cellular telephone records linked the victim to Rob McMahon before the shooting. The coram nobis court asked, "So how valuable would it have been . . . to the defense to actually have a person to have investigated and subpoenaed?" Hopkins answered, "I think it might have been valuable for the purposes of trying to settle it, to negotiate it." He also stated that knowing Rob's last name before trial "may have" resulted in a different judgment.

On cross-examination by the State, Hopkins acknowledged that Roby knew about Rob's involvement in the victim's death on January 3, 2016, but did not tell him about Rob until July or August 2018. Hopkins also acknowledged that Roby's claim that Rob shot the victim was inconsistent with Roby's claim that Roby did not know anything about the victim's death. Finally, Hopkins acknowledged that Roby lied to the police when Roby told them that he was with his girlfriend on the night of January 2.

Roby testified that he heard Hopkins testify and that Hopkins "left out some parts and he mixed some parts up that I told him." The coram nobis court asked if Roby was present when the victim was shot, and Roby said no. He said he told Hopkins that Rob lived in Nashville and was "a white guy." He also told Hopkins what kind of car Rob drove. Roby said Hopkins "misconstrued" what Roby said about the victim's death and explained as follows: In the early morning hours of January 3, 2016, Roby, the victim, and Allen met with Rob so that the victim and Rob could conduct a drug transaction. The victim and Rob got into an argument, the victim "reach[ed] for something," and the victim and Rob "started wrestling." Roby "took off" and "jumped in the car." Roby told the victim to "come on," but the victim did not come to the car. Roby said, "And I was going to help him out, but a light came on in the house and I didn't. I wasn't trying to deal with this after the situation that just transpired in [Smyrna]." Roby left the victim on Old Smith Springs Road and heard gunshots. He stated that only a drug transaction was supposed to occur and that he and Allen did not know Rob was going to shoot the victim. He said he waited to tell Hopkins that Rob was the actual shooter because "I didn't want to tell on nobody."

Roby testified that Rob used to work with him and the victim at Interstate Warehousing but that Rob "got fired some months before." On the day the jury convicted

Roby, Roby returned to jail and saw Rob in one of the "pods." Roby contacted his father, and his father contacted Hopkins.

On cross-examination, Roby testified that he withheld information about the shooting from Hopkins but denied lying to Hopkins. He acknowledged that if he had told the police about Rob, they could have helped him find Rob. He also acknowledged sending texts to Allen in which Roby asked for a favor and in which Roby said he needed to "get rid" of the victim. Roby explained that the victim was intoxicated and acting belligerent on the night of January 2 and that he did not want to be around the victim. Roby acknowledged that Allen gave a statement to police in which Allen claimed he saw Roby shoot the victim.

In a written order, the coram nobis court first found that the petition did not raise a claim of newly discovered evidence because Roby allegedly knew at trial that Rob was the actual shooter; Roby just did not know Rob's last name. The coram nobis court noted that Roby claimed to have known about Rob more than two years before trial and that Roby did not to bring the information to anyone's attention until two months before trial. The court then found Roby not credible. The court again noted that Roby waited until two months before trial to tell his attorney about Rob and stated that Roby had a "history of lying in relation to this case, both to the police and to his attorney." The court said Roby's attempt to explain the incriminating evidence against him was "simply incredible" and "defies logic." Accordingly, the coram nobis court denied the petition.

The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105 and provides as follows:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith. . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Crim. Ann. § 40-26-105(a), (b). Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). The writ "is an extraordinary procedural remedy . . . [that] fills

- 23 -

only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (emphasis omitted).

Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527 (emphasis omitted). In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

We agree with the coram nobis court that Roby's information about Rob being the actual shooter is not newly discovered evidence within the meaning of the coram nobis statute because Roby knew about Rob at trial. In any event, the coram nobis court found Roby not credible and, therefore, was not satisfied as to the veracity of the evidence. Thus, we conclude that the coram nobis court did not abuse its discretion by denying the petition.

## E. Subpoena

In related argument, Roby claims that he was denied his right to subpoena witnesses because he told Hopkins two months before trial that he wanted Rob subpoenaed to trial. Granted, criminal defendants have a fundamental, constitutional right to the "compulsory attendance of witnesses under the Sixth Amendment of the United States Constitution, and Article I, Section 9, of the Constitution of Tennessee." State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982). In this case, though, Hopkins testified that he was unable to learn Rob's identity from the information Roby provided. He further stated that if he had known Rob's last name before trial, he "would have taken further steps." Therefore, we find no merit to Roby's claim that he was denied the right to subpoena witnesses.

## F. Sufficiency of the Evidence

Allen claims that the evidence is insufficient to support his conviction. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree premediated murder is the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). "'[P]remeditation' is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the defendant's prior relationship to the victim which might suggest a motive for the killing; (2) the defendant's declarations of intent to kill; (3) the defendant's planning activities before the killing; (4) the manner of the killing, including the defendant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the defendant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; Bland, 958 S.W.2d at 660.

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

Taken in the light most favorable to the State, the evidence shows that on the night of January 2, 2016, Roby and the victim robbed Dallas Padgett of marijuana in Smyrna. During the robbery, Roby shot Padgett in the chest with Roby's nine-millimeter handgun. Roby and the victim fled from the scene and went to Interstate Warehousing in Murfreesboro, where they were employed. Roby went inside the building while the victim waited outside. The two men then went to Rebekkah Barrett's apartment and the Walmart near her apartment. At Walmart, they bought nine-millimeter ammunition and a new cellular telephone for the victim. While the victim was paying for the ammunition, Roby texted his friend, Allen, that he needed "a favor" from Allen. Allen asked what Roby needed, and Roby responded that he had to "get rid" of the victim and that he was trying to get the victim "drunk." Allen asked what Roby wanted him to do. Roby responded that he wanted to get the victim somewhere "isolated" and that he was buying "shells" in Walmart. Indeed, the proof showed that Roby and the victim were in Walmart buying nine-millimeter ammunition while Roby was texting Allen. Allen responded to Roby's text and wanted to know the "plan." Roby and the victim left Walmart and drove to Allen's apartment. Roby continued texting Allen. In the texts, Roby advised Allen that "he told" and that detectives were looking for Roby at Interstate Warehousing.

Call detail records for the victim's, Roby's, and Allen's cellular telephones showed that at 12:30 a.m. on January 3, the three men were in Murfreesboro. Shortly thereafter, though, they got into Victoria Robertson's car and traveled on Interstate 24 toward Nashville. At 1:05 a.m., residents on Old Smith Springs Road in Nashville heard multiple gunshots. A car sped away from the scene, and one of the residents saw an object in her yard that looked like a "dumped" Christmas tree. That object turned out to be the victim's body. After the shooting, Roby and Allen returned to Allen's apartment in Murfreesboro. Robertson testified that the Roby and Allen left with the victim but returned without him and that Roby and Allen were acting "[f]ine, normal" when they returned. Microanalysis of the projectiles and shell casings found in Smyrna and Nashville showed that Roby's nine-millimeter handgun was used to shoot the victim.

Citing State v. Terrance Heard, No. W2001-02605-CCA-R3-CD, 2003 WL 22718439, at *19 (Tenn. Crim. App. at Jackson, Nov. 6, 2003), Allen contends that his

mere presence at the scene when the victim was killed was not enough to convict him of first degree premediated murder. However, the evidence shows that Allen was more than merely present. When Roby texted Allen that he wanted to get rid of the victim, Allen asked what Roby wanted to him to do and told Roby to let him know the "plan." Roby's texts to Allen revealed that Roby planned to get the victim intoxicated and take him to an isolated location. Roby also advised Allen that he was buying shells, which showed that Roby planned to shoot the victim. Allen, knowing that Roby was planning to shoot the victim, later used his girlfriend's car to drive Roby and the victim to Old Smith Springs Road, a dead-end street. Roby shot the victim ten times, and Allen drove Roby back to Murfreesboro.

During the jury instruction for criminal responsibility, the trial court instructed that

mere presence during the commission of the offense is not sufficient to support a conviction. Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all the essential elements of said offenses have been proven by the state beyond a reasonable doubt.

Given the evidence in this case, a reasonable jury could have concluded that Allen was well-aware of Roby's plan to kill the victim and assisted Roby in that plan. The evidence against Roby was overwhelming, and the evidence against Allen was strong. Therefore, we have no hesitation in concluding that the evidence is sufficient to support both of their convictions.

## G. Photographs

Finally, the Appellants contend that the trial court erred by allowing inflammatory crime scene and autopsy photographs into evidence. The State argues that the trial court did not err. We agree with the State.

At trial, the Appellants objected to the admissibility of certain crime scene and autopsy photographs. Prior to Tamera Hawkins's testimony, the trial court addressed the admissibility of four photographs taken of the victim's body on Old Smith Springs Road. The first photograph showed the victim, from just below his clothed buttocks to his head, lying face-down on the ground with blood on the right side of his face. The second photograph showed the victim's left hand, which was holding a cellular telephone, and his back. The victim was wearing the black hoodie with animal-print sleeves. The third photograph showed the victim's bare stomach; money and a charger, which the police found in his pockets, were on his stomach. The fourth photograph showed the victim's lower body, and he was wearing black boots.

Counsel for Roby offered to stipulate that the victim was found with the telephone in his hand and was found wearing the black boots, making the introduction of those photographs into evidence unnecessary. The State argued that the photographs were relevant to show the location and position of the victim's body, that the victim was unarmed, and that he was wearing Roby's boots. The trial court ruled that the photographs were relevant to issues at trial, that they were not unduly gruesome, and that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. Officer Rosenfeld testified about the photographs, and the State introduced them into evidence during his testimony.

During Dr. Lewis's testimony, the trial court held a jury-out hearing to consider the admissibility of photographs taken during the victim's autopsy. In the hearing, Dr. Lewis testified that the autopsy photographs would be "very helpful" to her in explaining her autopsy report and the locations of the gunshot wounds to the jury. On cross-examination by counsel for Roby, Dr. Lewis testified that "I can verbalize it" but that "it's more easily understood with the photographs." Counsel for Roby argued that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice and offered to "stipulate to the facts shown in the photographs." The trial court noted that autopsy photographs "can be traumatic" for jurors but stated, "The doctor's indicated that, yes, words can describe, her diagram could describe, but she's indicated photos would be extremely helpful in describing, for example, the stippling or whatever she's going to describe in terms of the gunshot residue. Photos can best show that." The trial court found that the photographs were highly probative to show the number of gunshot wounds and the locations of the wounds. The trial court ruled that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice as to one of the autopsy photographs but not the others. Thus, the trial court ruled that those photographs were admissible.

"The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003) (quoting State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978)). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951. The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a clear showing of an abuse of that discretion. Banks, 564 S.W.2d at 949; State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997).

Here, the crime scene photographs were neither gruesome nor horrifying. Moreover, they were relevant to show the position in which the victim's body was found,

to show the cellular telephone in his hand, to show that he was wearing Roby's black boots, and to show that money remained in his pockets after the shooting. As to the autopsy photographs, they were more graphic than the crime scene photographs. However, they were not particularly gruesome or horrifying and were relevant to show the number of the victim's gunshot wounds and locations of those wounds. We note that during Dr. Lewis's testimony, she often used medical terms to explain the victim's autopsy report and the locations of the ten gunshot wounds to the jury, and we found the photographs to be very helpful in understanding her testimony. Thus, the trial court did not abuse its discretion by ruling that the photographs were admissible.

## III. Conclusion

Based upon the oral arguments made on behalf of Allen, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE